**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (#134180)
Michael Goldberg (#188669)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**POMERANTZ LLP**
Jeremy A. Liebermann (admitted pro hac vice)
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK NATHANSON, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>POLYCOM, INC., ANDREW M. MILLER, MICHAEL R. KOUREY, and ERIC F. BROWN,<br><br>　　　　　　　　　　Defendants. | **No. 13-3476 SC**<br><br>**<u>CLASS ACTION</u>**<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Mark Nathanson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Polycom Inc. ("Polycom" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Polycom securities between January 20, 2011 and July 23, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials and/or directors.

2.     Polycom provides standards-based unified communications and collaboration (UC&C) solutions for voice and video collaboration. The Company offers video, voice, content-management and content-sharing solutions, such as telepresence and conference room

1  systems, home/work office solutions, applications for mobile devices, browser-based video

2  collaboration, cloud-delivered services, and specialized healthcare video carts.

3          3.      Unbeknownst to investors, throughout the Class Period, the Company's CEO,

4  Andrew Miller, submitted numerous false expense reports, claiming personal expenses as

5  business expenses.  On July 23, 2013, the Company shocked investors when it announced that

6  Miller, who spent three years at Polycom's helm, resigned as CEO and Board member "after

7  the Audit Committee of the Board of Directors found certain irregularities in [his] expense

8  submissions." Miller "accepted responsibility" for his transgressions.  The Company's review

9  of Miller's expenses is ongoing, "including for the years ended December 31, 2010, 2011, and

10  2012."

11          4.      The Company announced that the SEC has commenced an investigation into the

12  Audit Committee's review of Miller's expenses and his resignation.  Polycom represents that it

13  is cooperating with the investigation.  To date, Polycom spent over $3 million in connection

14  with the SEC investigation.

15          5.      According to confidential witnesses ("CWs"), Miller has improperly submitted

16  expenses associated with remodeling his penthouse; buying and renting luxury cars; money

17  spent on his mistress; expensive dinners; and chartered jets.  For example, when Miller took

18  business trips, his luxury rental cars procured on the Company's tab were sometimes returned

19  days after Miller left the city.  The cars were used by his mistress.  Miller's ex-wife also

20  recounted that during a company trip to Sydney, Australia, Miller invited her and several of her

21  friends who lived there to an expensive dinner to celebrate her birthday and expensed the entire

22  dinner on Polycom.  On another trip, this time to Buenos Aires, where Miller's former wife

23  accompanied Miller to celebrate the achievements of Polycom's local employees, Miller

1   chartered a jet after the meeting to take him and his wife to see Iguazu Falls, one of the top

2   destinations in South America.  That trip had no business purpose and none of the lower level

3   Polycom employees for whom the meeting had been arranged in Argentina were invited to the

4   luxurious splash.  Nevertheless, Miller charged the trip to Polycom.

5        6.    Defendants' failure to properly account for Miller's false expense submissions

6   caused Polycom to report false and misleading operating expenses.    Moreover, Miller's

7   improper classification of personal expenses as business expenses constituted a theft of the

8   Company's assets.  Defendants falsely reported these losses as part of the Company's normal

9   operating expenses.   The amounts should properly have been reported in the Company's

10  financial statements as a loss due to the management's misappropriation of assets and not as a

11  normal operating expense.  Thus, the nature of the expenses was materially misstated.

12       7.    Miller's falsification of his expense reports constituted fraud at the highest level

13  of management.   The tone set by top management—the corporate environment or culture

14  within which financial reporting occurs—is the most important factor contributing to the

15  integrity of the financial reporting process.

16       8.    The Company's filings on form 10-K with the SEC for the years ended

17  December 31, 2010, 2011, and 2012 contained reports from management, signed by the

18  Company's CEO and CFO, stating that management had conducted an evaluation of the

19  effectiveness of controls over financial reporting, and concluding that "*our internal control

20  over financial reporting was effective to provide reasonable assurance regarding the reliability

21  of financial reporting and the preparation of financial statements for external purposes in

22  accordance with generally accepted accounting principles.*"   Contrary to these reports, the

23  actions of the CEO and the false reporting of Miller's personal expenses demonstrated that the

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Company's controls over financial reporting were not effective in preventing or timely detecting a material error in the financial statements, as well as a material misappropriation of the Company's assets.

9. Moreover, Miller's submission of phony expense reports violated Polycom's Code of Business Ethics and Conduct, which explicitly prohibited employees from "us[ing] Polycom funds for any personal purpose" and required them to submit "accurate" expense reports. Miller publicly represented to investors that he would adhere to the Company's Code of Business Ethics and Conduct, including the submission of accurate expense reports, but failed to do so in violation of the Company's Code.

10. Miller's rampant falsification of expense reports jeopardized his position at the helm of the Company, threatening Polycom's stability and stock price. Despite the precariousness of his position resulting from these false submissions, Miller assured investors that he was "planning on being [at Polycom] for quite a period of time."

11. The risks associated with Miller's illicit actions were particularly material to investors in light of Miller's importance to Polycom's success. Miller was credited for Polycom's ability, "for the first time in [its] history, [to] put together seven quarters of sequential growth." Indeed, Miller was considered the "primary architect" of Polycom's sales ("go-to-market") initiative, a "transformation" and "culturally a huge shift" that contributed to Polycom's strong financial performance. As part of that shift, Miller had replaced "42% of the sales team." Miller also made "a complete change up in the executive team" that is "rarely seen," replacing the Company's executives with a "top notch management team" loyal to him.

12.     On July 23, 2013, Polycom unexpectedly announced that Miller had resigned after the board found "irregularities" in his expense submissions. The Company stated that Miller had accepted responsibility for his actions.

13.     Analysts slammed Polycom following Miller's resignation, downgrading it to "underperform" and "underweight."  PiperJaffray declared that "[t]he departure of CEO Andy Miller…raises red flags and we believe management credibility (at all executive levels) comes into question."  Janney Capital similarly warned that because Miller "spearheaded the recent expansion in direct selling model and recruited most of the current sales leadership team," the "sales turnover is a real threat."  In a similar vein, Wedbush concluded that "[g]iven Miller's role in shaping senior management, we also have concerns regarding the potential for additional management upheaval and sales force attrition" and, as an example, pointed to the departure of Polycom's Executive Vice President of Global Sales, a Miller appointee.

14.     When grilled about the impact of Miller's departure on Polycom's "organizational stability" as a result of Miller's "very loyal following at the company," Polycom's interim CEO was forced to acknowledge that "[t]his is obviously a tough set of circumstances" and "undoubtedly, a significant change."

15.     On this news, Polycom shares fell $1.69 cents, or over 15% percent, to $9.49 per share on July 24, 2013, on volume of over 14 million shares. This drop eviscerated over $275 million in market value.

16.     Throughout the Class Period, defendants made materially false and misleading statements, misrepresenting and/or failing to disclose the following: (i) Miller was misappropriating Polycom's funds for personal expenses in material amounts; (ii) Miller had been submitting false expense reports, creating a significant risk that he would be terminated

from the Company, thereby jeopardizing the Company's stability and future success; (iii) Miller's false expense reports caused defendants to report false and misleading operating expenses; (iv) contrary to Miller's public representations, he regularly violated Polycom's Code of Business Ethics and Conduct, and was therefore subject to dismissal at all relevant times; and (v) contrary to its public representations, the Company did not have effective internal controls over its business and financial operations.

17. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Polycom's principal place of business is located within this District.

21. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## PARTIES

22.     Plaintiff, as set forth in the Certification previously filed with the Court, acquired Polycom securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant Polycom is a Delaware corporation with its principal executive offices located at 6001 America Center Drive, San Jose, California. Polycom common stock trades on the NASDAQ under the ticker symbol "PLCM."

24.     Defendant Andrew M. Miller ("Miller") served as the Company's Chief Executive Officer ("CEO") and President between May, 2010 and July 2013, at which point he resigned his position.  Prior to becoming the Company's CEO, Miller served as Executive Vice President, Global Field Operations, from June 2009 to May 2010.

25.     Defendant Michael R. Kourey ("Kourey") served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until his retirement on February 20, 2012.  Kourey also served as the Company's Executive Vice President, Finance and Administration.

26.     Defendant Eric F. Brown ("Brown") was appointed as the Company's CFO, Chief Operating Officer, and Executive Vice President on February 21, 2012, after Defendant Kourey's retirement.

27.     The defendants referenced above in ¶¶ 24-26 are sometimes referred to herein as the "Individual Defendants."

28.     The defendants referenced above in ¶¶ 23-26 are sometimes referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Polycom describes itself as "a global leader in unified communications ("UC") solutions and a leading provider of telepresence, video, voice and infrastructure solutions based on open standards." (2010 10-K at 3). The Company's UC solutions run the gamut from immersive telepresence to desktop video to mobile devices, and span voice, video, content management, and sharing solutions. (*Id*. at 6).

30.     Polycom competes in the UC market with multiple competitors in each product line. (*Id*. at 12). The Company's competitors include Cisco Systems, Inc. (Polycom's primary global competitor), Logitech International S.A., RADVISION Ltd., Avaya, HP, and Motorola, Inc. (*Id*. at 12-13). Polycom's competitive landscape "has changed throughout 2009 and 2010 and continues to rapidly evolve as competitors consolidate, increase their corporate partnerships, develop new technologies, and change their pricing strategies." (*Id*. at 12).

31.      Polycom operates globally and is managed geographically in three segments: the Americas; Europe, Middle East and Africa; and Asia Pacific. (2010 10-K at 41). The Company reported revenues of $1.2 billion for 2010, the year that Miller became CEO, a spike of $251.5 million, or 26%, over 2009, driven by increases in both product and service revenues. (2010 10-K at 41, 43). By the end of 2012, Polycom's revenues reached $1.4 billion.

### Miller Shifts Polycom Into a Go-To-Market Direction

32.     A company's go-to-market strategy is the mechanism used to deliver the company's unique value proposition to its target market. The main focus of this strategy is to target the direct customer. Typically, the go-to-market approach brings together all the commercial actions—marketing, sales, brand management, pricing, and customer insight—to drive the bottom line.

33.     Miller joined Polycom on July 1, 2009, as Executive Vice President of Global Field Operations.  Defendant Kourey described Miller's hiring as "a very important addition" to the Company, given his extensive background and uniquely superior go-to-market skills. (Piper Jaffray Technology, Media & Telecommunications Conference, 11/9/2010).  Miller spent 11 years at Cisco and held a number of senior key sales and go-to-market roles.  (*Id*.) After Cisco, Miller was the CEO of Polycom's "archrival," Tandberg.  (*Id*.)  Miller "had a great and frankly unique on the planet, background to come into Polycom into that EVC Global Field Ops role."  (*Id*.)  As Defendant Kourey explained, "a lot of the benefits that [investors] [are] seeing in [Polycom's] execution, a lot of the improvements in execution really began when [Miller] came on board in July of 2009…there have been a lot of great things that have happened since May of 2010, because in May of 2010, we promoted him to CEO."  (*Id*.) Miller "grew up in [the] go-to-market—he was a salesman and worked his way up into the senior rates of go-to-market management…So [Polycom] ha[s] a very go-to-market savvy CEO that is out there working with the sales team, and the customers themselves, and the prospects, and the partners, almost perpetually—I mean, personally he is on the road, out of 90, 95% of the time meeting with customers and partners."  (*Id*.)

34.     In his initial role as Executive Vice President of Global Field Operations, Miller strategized, directed and implemented Polycom's aggressive shift to a go-to-market approach. In fact, Miller was brought in "to take over [Polycom's] go-to-market organization, take it to the next level."  (UBS Global Technology and Services Conference, 6/8/2010).  As part of that go-to-market transformation, Polycom spent significant resources in additional sales coverage for underserved areas and in building demonstration centers across the world to more effectively compete in the marketplace.  (*Id*.)  Polycom also increased its sales engineering

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

coverage by improving the mix of sales engineers to sales people in order to more effectively market its products.  (Bank of America Merrill Lynch SMID Cap Conference, 6/9/2010).  The Company invested not only in its quota-carrying sales team, but also in the support, training, marketing, infrastructure and facilities areas that supported the success of its sales' team.  (Cowen and Company Technology Media & Telecom (TMT) Conference, 6/3/2010).  As part of incentivizing its sales team, Miller devised a commission-based structure that increased rewards for sales of higher gross-margin products.  (UBS Global Technology and Services Conference, 6/8/2010; William Blair Growth Stock Conference, 6/5/2010).  Miller "lead[] that [strategy] effort very successfully."  (UBS Global Technology and Services Conference, 6/8/2010).

35.    In doing the "heavy lifting" of Polycom's transformation, Miller made "significant change[s] with the sales force."  (Bank of America Merrill Lynch SMID Cap Conference, 6/9/2010).  "[S]ince start[ing] this [transformation] process in October of 2009, [Miller] hired a net addition of 164 individuals in the sales organization, 49 of which were made in Q2."  (Polycom Q2 2010 Earnings Call, 7/15/2010).  Indeed, Miller announced the he "changed out 42% of the sales team which is not for the weak of heart.  And [Polycom] did that because Polycom was always a channel-led company.  It was not a high touch company like Cisco.  We felt—I felt strongly that for us to compete against Cisco and win, it had to be high touch."  (Sanford C. Bernstein & Co. Strategic Decisions Conference, 6/3/2011).  The Company said Miller was "deadly serious about speed and precision [a]nd accountability and performance and intensity."  (*Id.* (6/9/2010)).

36.    Miller also created Polycom's Open Collaboration Network, a key partnership with seven providers: Microsoft, IBM, Juniper, Avaya, Siemens, Broadsoft and HP.  (Cowen

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

and Company Technology Media & Telecom (TMT) Conference, 6/3/2010).  This partnership enabled Polycom to integrate with these critical providers not only from a technology perspective, but also from a go-to-market perspective in order to provide choice for customers, as well as investment protection.  (*Id.*)  Polycom is the only independent open standard-based solution provider that can interface and work within a Microsoft OCS or IBM environment, giving the Company a "huge advantage…in the marketplace."  (*Id.*)  Accordingly, the Polycom Open Collaboration Network was a "key part" of Polycom's strategy.  (*Id.*)  As part of that alliance, Polycom co-founded the Unified Communications Interoperability Forum, designed to make unified communications open and interoperable.  (UBS Global Technology and Services Conference, 6/8/2010).  Polycom's Open Collaboration Network has been driving significant customer wins for the Company.  (Polycom Q1 2011 Earnings Call, 4/21/2011).  For example, 23% of Polycom's revenues in the fourth quarter of 2010 were a direct result of the network.  (Morgan Stanley Technology, Media & Telecom Conference, 3/1/2011).

37.     Polycom consistently acknowledged Miller's contributions to the Company's success: Miller "has brought with him over the last almost a year now strong customer-centric approach, very much focus on partners, very much a focus on meeting the demand that is now in front of us and I know one of the things that Andy is very focused on is augmenting what has been a technology and product centricity and adding that customer centricity to it."  (JMP Securities Research Conference, 5/10/2010).  Miller was considered the "primary architect" of Polycom's go-to-market initiative, a "big deal," a "big investment."  (Bank of America Merrill Lynch SMID Cap Conference, 6/9/2010).  Miller "came in and he was a key driver of that strategic investment model that we developed and the execution plan.  If you look at those initiatives, he was…leading the preponderance of the heavy lifting there.  The go-to-market

build out by definition, that was his job. The strategic partnership, absolutely…So as far as the strategy and the financial commitments, 100% in line…this isn't a third-party individual coming in…[h]e is just the opposite. Very much involved in driving it before and is involved completely now as CEO in driving the plan." (*Id.*) . . . "So I think you see it in the go-to-market transformation, it's exciting, people love it. The channels like what they're seeing, the sales force likes what they're seeing, now with him in the bigger job, the whole company likes it." (*Id.*) It was "culturally a huge shift." (Wells Fargo Securities Technology, Media & Telecom (TMT) Conference, 11/10/2010). In short, from a go-to-market standpoint, Miller's addition was "really nothing [short] of transformative." (*Id.*)

38.    Miller "more effectively aligned [Polycom's] resources by geography, vertical market and strategic alliance…and…also continued to shift [its] mix of sales staff, from six quota-bearing salespeople per sales engineering just nine months ago, to 2.2 quota-bearing salespeople per sales engineer. That ratio and this improvement is now enabling Polycom to both capture more wallet share, as well as deepen the relationships with [the Company's] customers and IT organizations." (Polycom Q2 2010 Earnings Call, 7/15/2010). As a result, Polycom is "achieving a stronger ramp in sales productivity that is well ahead of plan." (*Id.*).

39.    Thus, having "been leading that [go-to-market] effort very successfully," Miller was "promoted to the CEO position." (UBS Global Technology and Services Conference, 6/8/2010). Immediately after this elevation, Miller announced that he "decided to structure [Polycom's] go-to-market leadership team as direct reports to [him]…mean[ing] that [the Company's] theater presidents for the Americas, EMEA and Asia-Pacific are now on the executive staff team and [Miller] [wi]ll be more directly involved with each of [Polycom's] theater presence operations." (Polycom Q2 2010 Earnings Call, 7/15/2010). "In concert with

this organizational approach, you'll see me take a very active role as CEO with the executives of our strategic partners, channel partners, and customers around the world," Miller said.  (*Id*).

**In a Rare Move, Under Miller's Command, Polycom Completely Reshuffles Its Executives**

40.     As CEO of Polycom, Miller made "significant management changes" at Polycom, bringing in six world-leading executives at one time, comprising an entirely new executive management team.   (Piper Jaffray Technology, Media & Telecommunications Conference, 11/9/2010).  Miller told investors that he "simultaneously…hired six of the best executives on the market to help drive Polycom to its next $1 billion revenue growth opportunity:" (i) Sudhakar Ramakrishna, with a "stellar reputation and career" at Motorola, where he ran the Mobility and Wireless Group, joined Polycom as the General Manager of Products, Engineering, Services and Operations, as well as Chief Development Officer; (ii) Joe Burton, former Chief Technology Officer for Unified Communications at Cisco, joined Polycom to help drive its strategy and technology; (iii) Sue Hayden, former Vice President at Oracle Corporation, became Polycom's Executive Vice President and General Manager of the Company's line of business; (iv) Alan Rudolph, with a former "stellar career" at ACS and Xerox, was hired as Polycom's SVP of Services; (v) Gary Rider, who previously ran one the largest segments at NCR, joined Polycom as the President of Europe, Middle East, and Africa; and (vi) Ashley Goldsmith, who became Polycom's Senior Vice President of Human Resources.  (Polycom Analyst and Investor Meeting, 12/6/2010).

41.     As Miller himself acknowledged, when he "came on board as CEO, [the Company] made a complete change up in the executive team.  [The Company] hired six new executives simultaneously.  And [the Company] did that because [Miller] felt in order to initiate all the changes…[Polycom] needed a different set of executives to drive [it] to the next

level." (Sanford C. Bernstein & Co. Strategic Decisions Conference, 6/3/2011).   Through the "significant" shift to a go-to-market approach and the changeover in the executive team, the Company was "able to, for the first time in Polycom's history, put together seven quarters of sequential growth."  (*Id.*)   "But I would never want to do what I did last year again, and stability and momentum are key now," said Miller.  (*Id.*)

42.     In Defendant Kourey's own words, that kind of executive reshuffling is remarkably rare:

> But what [Miller] has done and with the legacy management team, has made some significant changes and I won't go in depth into each one of these names, but we've brought on a really top notch management team into this company and this was just a couple of months ago.  We actually announced all six of these in one day, something that I'm not sure I've ever seen before, but it was a significant shift in, and additions to our management.
>
> *          *          *
>
> We had brought in a new go-to-market organization under the leadership of Andy Miller as our EVP of Global Field Operations back in July 2009, and in May we made him the CEO of the company.  And with that, we made some significant management additions to the company later in the year.  We actually, on a single day, announced six new executives on the executive team.  Something that is rarely seen, but in fact, we brought in some very high-powered additions to the team…

(Barclays Capital Global Technology Conference, 12/8/2010; Morgan Stanley Technology, Media & Telecom Conference, 3/1/2011).

43.     Kourey praised Miller for his ability to "sell[] some of these executives to quit the[ir] great jobs and come over to Polycom and really swing for the fences."  (Piper Jaffray Technology, Media & Telecommunications Conference, 11/9/2010).

**Polycom's Code of Business Ethics and Conduct**

44.     Prior to the onset of the Class Period, Polycom adopted a Code of Business Ethics and Conduct (the "Code"), which applied to the Company's "directors and employees,

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

including [the Company's] principal executive officer."   The Code, which the Company

incorporated by reference in its annual reports on Form 10-K, provides that

> Polycom funds must be used only for Polycom business purposes. Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom receives good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure. **Expense reports must be accurate and submitted in a timely manner. Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.**

(Code at 13) (emphasis added).

45.    Polycom's Code required Miller to submit accurate expense reports and

prohibited Miller from using Polycom's funds for personal purposes.

46.    Miller's employment at Polycom was explicitly "contingent upon" his

"understanding of, and commitment to, the standards and policies contained in Polycom's Code

of Business Ethics and Conduct."  (Miller Offer Letter dated 6/5/2009, filed with the SEC on

July 31, 2009).   Miller publicly attested that he understood and committed himself to

complying with the Code.  (*Id.*)

47.    By falsifying and submitting inaccurate expense reports, Miller's conduct was in

direct contravention of the Code, as well as Miller's representation to the investing public that

he would comply with the Code and would not use Polycom's funds for personal purposes.

**The Expense Approval Process at Polycom**

48.    According to confidential witnesses ("CWs"), Polycom had a tightly-monitored

expense report approval process.  Expenses that did not include matching receipts were sent

back to the employee.  Approved expense reports ultimately went to Accounts Payable, which

reimbursed employees via automatic deposit.  CW 1 was North America Sales Operation

Manager for Polycom from 2007 to August 2013, when he/she was laid off.  CW1 reported to

Cathy Bensink, Senior Director of North America Sales Operations.   CW 1 explained that the

expense approval procedure was strict and that all expenses had to have a matching receipt. When CW1 reviewed his/her subordinates' expense reports, CW 1 sent back anything that did not have a matching receipt, in compliance with Company policy.  CW 1 said Accounts Payable also reviewed receipts to ensure they matched what was claimed in the expense report. "They were pretty anal about checking every receipt," CW 1 said of the Accounts Payable department.  In his/her case, CW 1 submitted his/her expense reports to his/her supervisor, Bensink, for approval.  Eventually, CW 1's expense reports were reviewed and paid out by Accounts Payable.  Throughout the process, CW 1 received several emails alerting him/her to the expense report's status.  CW 1 received emails 1) confirming the report was submitted, 2) when the images of the receipts were viewable digitally, 3) when CW 1's boss approved the expenses, 4) when the report was received by Accounts Payable, and 5) when the expense report's status went from "approved" to "paid."

49.    CW 2 was Lead Senior Accountant for Polycom from February 2005 to July 2012.  CW 2 reported to Mike McMahon, Director of Accounting, and then to Carmen Evans, Accounting Manager.  CW 2 similarly related that the Company tightly monitored expense reports and employees were required to use an online software system to submit the reports. The software was called Concur.  Employees' immediate superiors typically approved expenses.  Receipts were always required.

50.    CW 3 was a Channel Account Manager for Polycom from 2007 to July 2012, when his/her division was outsourced.  CW 3 also attested that Polycom had a specifically designed software program that employees used to submit their expense reports.  The system tracked the expense report's status as it moved from submission to approval to pay out. Receipts were required for every item that was expensed.

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

51.     CW 4 was the senior executive administrator for Polycom's former CEO Robert Hagerty from July 2008 to June 2010.  CW 4 reported to Hagerty and was let go immediately after Miller took over as CEO.  CW 4 said the CFO of Polycom must have approved Miller's expenses. This was the procedure when CW 4 worked for the former CEO, Hagerty, and it was the procedure at other companies where CW 4 worked for CEOs.   That meant that Kourey and subsequently CFO Eric Brown were responsible for approving Miller's expenses.

52.     CW 5 was an Executive Assistant to senior executives at Polycom's headquarters in Pleasanton, California from October 2008 to May 2010.  CW 5 reported to Chief Legal Officer Sayed Darwish and Joe Sigrist, Senior Vice President and General Manager, Video Solutions Group.  CW 5 explained that CFO Michael Kourey would have to review, answer questions and approve unusually high expenses, such as very expensive meals.  CW 5 believed the CFO approved executive expenses on a general basis.  "When I was there we had to do expense reports for everything," CW 5 said.  "The company was very careful about making sure everything was itemized."   Polycom employees were surprised that CFO Michael Kourey "would allow Andy to do some of the stuff he was doing" by approving his expenses.  According to CW 5, it was well-known on the C-Suite executive floor that Miller spent the company money lavishly, including on himself.  Miller had huge expenses, buying gifts for people, traveling, and dining out.  Employee comments about Miller's spending ranged from "he's going to take the company down," to "there goes the stock."

53.     CW 6 was a Senior Executive Assistant in Polycom's Human Resources Department from January 2007 to October 2011. CW 6 reported to Kathy Duarte, Director of Compensation and Benefits.  Duarte left the company when Andrew Miller became CEO, and CW 6 then began reporting to Mitchell Pulley, Vice President of Compensation and Benefits.

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

CW 6 remarked that CFO Eric Brown likely was aware of what was in Miller's expense reports and approved them.  According to CW 6, Miller "expensed literally everything.  It was over-the-top."  Miller's expenses were "off-the-charts."  These included daily living expenses such as meals, dry cleaning, transportation and entertainment.

### Miller Submits Expenses for Remodeling His Home

54.     CW 4 stated that when Miller took over as CEO, part of his compensation package included the temporary leasing of an apartment until he could move his family from Colorado to a new home in California.  Miller leased a "massive" penthouse in San Francisco and had two Polycom employees running errands to coordinate the décor and furnishings of the apartment.  Although it was supposed to be temporary, the apartment became permanent and Miller still rented it at the time of his resignation.  Miller's family never moved to California and Miller continued to commute from Colorado to California via airplane.

55.     "I find it hard to believe that the CFO and Sayed (the Chief Legal Officer) didn't know what was happening," CW 4 said.  Miller "was just spending the money of Polycom like it was his own," exclaimed CW 4.  This extravagant spending was in stark contrast to the previous CEO, Hagerty, who was extremely cost conscious and "never" wanted to spend Polycom's money.

56.     According to CW5, when Miller became CEO in May 2010, he rented a penthouse in San Francisco and the Company paid all of the expenses associated with the penthouse.  "He charged everything to the Company."  CW 5 remarked that he/she never heard of any other Polycom employees who had their homes and living expenses paid for by the company.  "The only one I ever heard about was Andy," she said.  "The only one."

57.     CW 3 also noted that Miller tried to expense remodeling costs for his home.

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Miller Rents Luxury Cars and Buys $500 Ties on Company Tab**

58.     According to CW 4, Miller only rented luxury class vehicles on business trips and when he commuted to Polycom's headquarters.  Since Miller technically lived in Colorado with his family and commuted by airplane to Polycom in California, he regularly rented cars for a week at a time.  "The cars were not what Hertz gave out regularly," CW 4 said.  "He drove very expensive cars."  CW 4 heard that Miller was once given a Chevy, and "I think he threw a fit."  CW 4 also heard from executive assistants that Miller asked them to buy $500 ties for him to give to top salespeople as a bonus.  But when the assistants asked one of the salesmen who was supposed to have received the tie about it later, the salesman did not know what the assistants were talking about.  The assistants believed Miller was keeping the ties for himself.

59.     CW 5 also recalled that Miller asked his assistant, Laurie Grover, to buy several $400-$500 ties from the luxury retailer Hermes, which were supposed to be gifts for other employees.  When Grover asked the employees about the ties later, the employees did not know what she was talking about.  Apparently, Miller had kept the ties for himself.

**Miller Buys a Tesla on Company Money**

60.     CW 2 heard from people who are in a position to know that Miller bought a Tesla automobile with company money.  A Tesla sells for anywhere from $69,900 – $94,900.

**Miller Spends Large Sums of Polycom's Money on His Mistress**

61.     CW 5 said that during Miller's tenure as CEO, he had a mistress who worked at the Company.  Herrick heard from Miller's executive assistant, Laurie Grover, that Miller was spending a lot of Company money on his mistress and that Miller's wife found out.  Grover told Herrick that Miller and his wife split or divorced over it.  The wife and children never

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

moved to California from Aspen, where Miller had been living with them prior to taking a job at Polycom.

62.     Likewise, CW 6 recounted that one of Miller's executive assistants, Elizabeth Loux, who regularly prepared Millers' expense reports, told CW 6 that when Miller traveled on business trips, his rental car was sometimes returned days after Miller had left a particular city or area where the car was rented.  The implication was that someone else was still driving the car.  CW 6 said the talk among executive assistants was that Miller had a mistress who was using the car after Miller left a town he visited.  CW 6 believed that Miller's mistress was an executive he hired in September 2010.

**Miller Expenses Lavish Dinners and Charters Jets on Polycom's Tab**

63.     CW 7 was married to Miller for four years until they divorced on September 21, 2011.  CW 7 remarked that she "wasn't surprised about the news" that Miller left Polycom because he cheated on expense reports.

64.     For example, during a company trip to Sydney, Australia in the fall of 2010, CW 7 accompanied her husband.  Miller invited CW 7 and several of her friends who lived there to an expensive dinner to celebrate CW 7's birthday.  Only one Polycom employee attended the dinner—which was held at Tetsuya's—but CW 7 observed that Miller charged the whole fete on Polycom's credit card.

65.     On another trip, this one to Buenos Aires in Argentina, CW 7 accompanied Miller to a Company meeting to celebrate the achievements of Polycom's local employees. After the meeting, which was held around April 2011, Miller chartered a jet—at the Company's expense—to take him, CW 7, and several other Polycom executives to see Iguazu Falls, one of the top destinations in South America.  CW 7 noted that the trip did not include any of the

lower level local Polycom employees for whom the meeting had been arranged to recognize their achievements.  The trip to the falls did not have a business purpose.  Nevertheless, Miller charged the entire tour to the Company.

**Miller is Forced to Resign for Falsifying Expense Reports**

66.     On July 23, 2013, Polycom shocked the market when it suddenly announced that Miller was forced to resign as a result of submitting false expense reports.  Specifically, Polycom announced that Miller "resigned as Chief Executive Officer, President and a member of the Board of Directors on July 19, 2013, after the Audit Committee of the Board of Directors found certain irregularities in Mr. Miller's expense submissions, for which Mr. Miller accepted responsibility."  (Polycom Press Release, July 23, 2013).  Subsequently, on September 11, 2013, the Company announced that its "review of Mr. Miller's expenses has continued, including for the years ended December 31, 2010, 2011, and 2012" and that "[b]ased on its review to date, the Company believes that some of Mr. Miller's expenses during each of those years, which were accounted for as business expenses, were personal expenses."  (8-K dated September 11, 2013).  The Company also announced that the "SEC has commenced an investigation concerning the Audit Committee's review of Mr. Miller' expenses and his resignation, and it has requested information from [Polycom].  [Polycom] [is] cooperating with the investigation."  (*Id.*)

67.     As part of his Separation Agreement with the Company, Miller agreed that he will not delete or destroy any data related to his expense report machinations.  (Separation Agreement and Release at 3).

68.     To date, Polycom has spent almost $3 million in connection with Miller's forced resignation and the related SEC investigation.  (8-K filed 1/22/2014).

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**Materially False and Misleading**
<u>**Statements Issued During the Class Period**</u>

69.     On January 20, 2011, the Company issued a press release announcing financial results for the fourth quarter and fiscal year ended December 31, 2010.  The Company reported total operating expenses of $167 million for the three months ended December 31, 2010, including general and administrative expenses of $19 million, and reported total operating expenses of $626 million for the twelve months ended December 31, 2010, including general and administrative expenses of $75 million.  (*Id.*)

70.     On February 18, 2011, Polycom filed an annual report for the period ended December 31, 2010, on Form 10-K with the SEC, which reiterated the Company's previously announced financial results and financial position.  The 10-K was signed, among others, by Defendants Miller and Kourey.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Miller and Kourey, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting.  Defendants Miller and Kourey also both signed and approved the internal control report which is based on all of the financial statements for the year ending December 31, 2010. The Report read the following:

> We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of this evaluation, management has concluded that, as of December 31, 2010 our internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

(*Id*. at F-2).

---

71.     The 10-K reported total operating expenses for the year ended 2010 of $626 million, including general and administrative expenses of $75 million.  (2010 10-K at 39, F-5). The 10-K also announced that in September 2010, the Company hired six new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives.  The 10-K concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition. For example, our Chief Marketing officer has recently left the Company. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(2010 10-K at 28).

72.     Also included by reference in the 2010 10-K was the Company's Code, which was applicable to Polycom's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions.  The Code explicitly stated that:

> [p]rotecting Polycom's assets is a key responsibility of every employee, agent and contractor. Care should be taken to ensure that assets are not misappropriated, loaned to others, or sold or donated without appropriate authorization. All Polycom employees, agents and contractors are responsible for the proper use of Polycom assets, and must safeguard such assets against loss, damage, misuse or theft. Employees, agents or contractors who violate any aspect of this policy or who demonstrate poor judgment in the manner in which they use any Polycom

asset will be subject to disciplinary action, up to and including termination of employment or business relationship at Polycom's sole discretion.

*       *       *

Polycom funds must be used only for Polycom business purposes. Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom receives good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure. **Expense reports must be accurate and submitted in a timely manner. Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.**

(2010 10-K at 65; Code at 13) (emphasis added).

73.     The foregoing statements were materially false and misleading because they misrepresented and/or failed to disclose the following:

(i) Miller was misappropriating Polycom's funds for personal expenses in material amounts; (ii) Miller had been submitting false expense reports, creating a significant risk that he would be terminated from the Company, thereby jeopardizing the Company's stability and future success; (iii) Miller's false expense reports caused Defendants to report false and misleading operating expenses; (iv) contrary to Miller's public representations, he regularly violated Polycom's Code of Business Ethics and Conduct, and was therefore subject to dismissal at all relevant times; and (v) contrary to its public representations, the Company did not have effective internal controls over its business and financial operations.

74.     On April 21, 2011, the Company issued a press release announcing financial results for the first quarter ended March 31, 2011.  The Company reported total operating expenses of $170 million for the three months ended March 31, 2011, including general and administrative expenses of $18 million.

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

75.    On April 28, 2011, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2011, which included signed Certifications by Defendants Miller and Kourey, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting. The report reiterated the Company's previously announced quarterly financial results and financial position.   Polycom reported total operating expenses of $170 million, including general and administrative expenses of $18 million.   (Q1 2011 10-Q at 4).   The 10-Q also announced that in September 2010, the Company hired a number of new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives, but concealed that Miller, Polycom's most significant executive, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of multiple new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 49).

76.    On July 21, 2011, the Company issued a press release announcing financial results for the second quarter ended June 30, 2011.   The Company reported total operating

expenses of $182 million for the three months ended June 30, 2011, including general and administrative expenses of $21 million.

77.     On August 2, 2011, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2011, which included signed Certifications by Defendants Miller and Kourey, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting. The report reiterated the Company's previously announced quarterly financial results and financial position.   Polycom reported total operating expenses of $182 million, including general and administrative expenses of $21 million.   (Q2 2011 10-Q at 4).   The 10-Q also announced that in September 2010, the Company hired a number of new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives, but concealed that Miller, Polycom's most important executive, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of multiple new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we recently announced the addition of a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 50).

78.     On October 19, 2011, the Company issued a press release announcing financial results for the third quarter ended September 30, 2011.  The Company reported total operating expenses of $197 million for the three months ended September 30, 2011, including general and administrative expenses of $22 million.

79.     On October 31, 2011, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended September 30, 2011, which included signed Certifications by Defendants Miller and Kourey, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.   The report reiterated the Company's previously announced quarterly financial results and financial position.   Polycom reported total operating expenses of $197 million, including general and administrative expenses of $22 million.  (Q3 2011 10-Q at 4).  The 10-Q also announced that in September 2010, the Company hired a number of new executives, and touted that it hired a worldwide sales leader in the third quarter of 2011.  It warned that Polycom's success will depend on its ability to retain its highly qualified senior executives, but concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of multiple new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources. We announced the addition of a worldwide sales leader in the third quarter of 2011 and, most recently, changes impacting our sales leadership and organizational structure in North America. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, particularly with respect to the

execution of our go-to-market strategy and the expected resulting revenues, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id.* at 51).

80.     On January 23, 2012, the Company issued a press release announcing financial results for the fourth quarter and fiscal year ended December 31, 2011.  The Company reported total operating expenses of $200 million for the three months ended December 31, 2011, including general and administrative expenses of $21 million, and reported total operating expenses of $748 million for the twelve months ended December 31, 2011, including general and administrative expenses of $83 million.  (*Id.*)

81.     On February 17, 2012, Polycom filed an annual report for the period ended December 31, 2011, on Form 10-K with the SEC, which reiterated the Company's previously announced financial results and financial position.  The 10-K was signed, among others, by Defendants Miller and Kourey.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Miller and Kourey, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting.  Defendants Miller and Kourey also both signed and approved the internal control report which is based on all of the financial statements for the year ending December 31, 2011. The Report read the following:

> We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of this evaluation, management has concluded that, as of December 31, 2011 our internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

(*Id*. at F-2).

82.     The 10-K reported total operating expenses for the year ended 2011 of $748 million, including general and administrative expenses of $83 million.  (2011 10-K at 42, F-5). The 10-K also announced that Polycom recently made changes impacting its sales leadership and organizational structure in North America, and that it recently announced the retirement of its CFO and the appointment of a new CFO effective February 21, 2012, and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives. The 10-K concealed that Miller, Polycom's most significant executive,, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, we recently made changes impacting our sales leadership and organizational structure in North America. In addition, we recently announced the retirement of our current Chief Financial Officer and the appointment of a new Chief Financial Officer effective February 21, 2012. As these new executives and sales leaders assess their areas of responsibilities and define their organizations, it will likely result in disruption to the business and additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, particularly with respect to the execution of our go-to-market strategy and the expected resulting revenues, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 30).

83.     Also included by reference in the 2011 10-K was the Company's Code, which was applicable to Polycom's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions.  The Code explicitly stated that

[p]rotecting Polycom's assets is a key responsibility of every employee, agent and contractor. Care should be taken to ensure that assets are not misappropriated, loaned to others, or sold or donated without appropriate authorization. All Polycom employees, agents and contractors are responsible for the proper use of Polycom assets, and must safeguard such assets against loss, damage, misuse or theft. Employees, agents or contractors who violate any aspect of this policy or who demonstrate poor judgment in the manner in which they use any Polycom asset will be subject to disciplinary action, up to and including termination of employment or business relationship at Polycom's sole discretion.

\*       \*       \*

Polycom funds must be used only for Polycom business purposes. Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom receives good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure. **Expense reports must be accurate and submitted in a timely manner. Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.**

(2011 10-K at 71; Code at 13) (emphasis added).

84.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 73.

85.     On April 18, 2012, the Company issued a press release announcing financial results for the first quarter ended March 31, 2012.  The Company reported total operating expenses of $196 million for the three months ended March 31, 2012, including general and administrative expenses of $22 million.

86.     On May 1, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2012, which included signed Certifications by Defendants Miller and Brown, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting. The report reiterated the Company's previously announced quarterly financial results and financial position.  Polycom reported total operating expenses of $196 million, including general and administrative expenses of $22 million.  (Q1 2012 10-Q at 4).  The 10-Q also

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

announced that Polycom recently made changes impacting its sales leadership and organizational structure in North America, and that it recently announced the retirement of its CFO and the appointment of a new CFO effective February 21, 2012, and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives. The 10-Q concealed that Miller, Polycom's most significant executive, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, we recently made changes impacting our sales leadership and organizational structure in North America. In addition, we recently announced the retirement of our Chief Financial Officer and the appointment of a new Chief Operating Officer and Chief Financial Officer effective February 21, 2012. As these new executives and sales leaders assess their areas of responsibilities and define their organizations, it will likely result in disruption to the business and additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, particularly with respect to the execution of our go-to-market strategy and the expected resulting revenues, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 46).

87.     On July 24, 2012, the Company issued a press release announcing financial results for the second quarter ended June 30, 2012.  The Company reported total operating expenses of $210 million for the three months ended June 30, 2012, including general and administrative expenses of $24 million.

88.     On August 1, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2012, which included signed Certifications by Defendants Miller and Brown, stating that the financial information contained in the Form 10-Q was

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

accurate and that they disclosed any material changes to the Company's financial reporting. The report reiterated the Company's previously announced quarterly financial results and financial position.  Polycom reported total operating expenses of $210 million, including general and administrative expenses of $24 million.  (Q2 2012 10-Q at 4).  The 10-Q also announced that Polycom recently made changes impacting its sales leadership and organizational structure in North America, that it recently announced the retirement of its CFO and the appointment of a new CFO effective February 21, 2012, and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives.  The 10-Q concealed that Miller, Polycom's most significant executive, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, we recently made changes impacting our sales leadership and organizational structure in North America. In addition, we previously announced the retirement of our Chief Financial Officer and the appointment of a new Chief Operating Officer and Chief Financial Officer that took effect on February 21, 2012. As these new executives and sales leaders assess their areas of responsibilities and define their organizations, it will likely result in disruption to the business and additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, particularly with respect to the execution of our go-to-market strategy and the expected resulting revenues, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 50).

89.     On October 23, 2012, the Company issued a press release announcing financial results for the third quarter ended September 30, 2012.  The Company reported total operating

expenses of $214 million for the three months ended September 30, 2012, including general and administrative expenses of $27 million.

90.     On October 31, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended September 30, 2012, which included signed Certifications by Defendants Miller and Brown, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.    The report reiterated the Company's previously announced quarterly financial results and financial position.    Polycom reported total operating expenses of $214 million, including general and administrative expenses of $27 million.    (Q2 2012 10-Q at 4).    The 10-Q also announced that Polycom recently made changes impacting its sales leadership and organizational structure in North America and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives.    The 10-Q concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, we recently made changes impacting our sales leadership and organizational structure in North America. As new hires assess their areas of responsibilities and define their organizations, it will likely result in disruption to the business and additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, particularly with respect to the execution of our go-to-market strategy and the expected resulting revenues, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 52).

91.     On January 23, 2013, the Company issued a press release announcing financial results for the fourth quarter ended December 31, 2012.  The Company reported total operating expenses of $202 million for the three months ended December, 2012, including general and administrative expenses of $26 million.

92.     On February 13, 2013, during a conference call discussing the departure of executive Sudhakar Ramakrishna, which Polycom announced in a Form 8-K filed with the SEC the same day, Defendant Miller assured investors that he is "planning on being [at Polycom] for quite a period of time":

> Like anything else, Rama has aspirations; one day he'd like to be a CEO.  **And right now, I am and I'm planning on being here for quite a period of time.** So this has no implications on anything outside of being able to focus on software, focus on our next-generation platform, and to do it with style.

(Goldman Sachs Technology and Internet Conference, 2/13/2013) (emphasis added).

93.     On February 14, 2013, Polycom filed an annual report for the period ended December 31, 2012, on Form 10-K with the SEC, which reiterated the Company's previously announced financial results and financial position.  The 10-K was signed, among others, by Defendants Miller and Brown.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Miller and Brown, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting.  Defendants Miller and Brown also both signed and approved the internal control report which is based on all of the financial statements for the year ending December 31, 2012. The Report read the following:

> We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of this evaluation, management has concluded that, as of December 31, 2012 our internal control over financial

reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

(*Id*. at F-2).

94.     The 10-K reported total operating expenses for the year ended 2012 of $817 million, including general and administrative expenses of $98 million.  (2011 10-K at 40, F-5). The 10-K also warned that Polycom's success will depend on its ability to retain its highly qualified senior executives, and that executive departures could cause disruption to the business.  The 10-K concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. As new hires assess their areas of responsibilities and define their organizations, it will likely result in disruption to the business and additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 29).

95.     Also included by reference in the 2012 10-K was the Company's Code, which was applicable to Polycom's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions.  The Code explicitly stated that

> [p]rotecting Polycom's assets is a key responsibility of every employee, agent and contractor. Care should be taken to ensure that assets are not misappropriated, loaned to others, or sold or donated without appropriate authorization. All Polycom employees, agents and contractors are responsible for the proper use of Polycom assets, and must safeguard such assets against loss, damage, misuse or theft. Employees, agents or contractors who violate any aspect of this policy or

who demonstrate poor judgment in the manner in which they use any Polycom asset will be subject to disciplinary action, up to and including termination of employment or business relationship at Polycom's sole discretion.

                    *        *        *

Polycom funds must be used only for Polycom business purposes. Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom receives good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure. **Expense reports must be accurate and submitted in a timely manner. Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.**

(2012 10-K at 70; Code at 13) (emphasis added).

96.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 73.

97.     On April 23, 2013, the Company issued a press release announcing financial results for the first quarter ended March 31, 2013.  The Company reported total operating expenses of $200 million for the three months ended March 31, 2013, including general and administrative expenses of $24 million.

98.     On April 30, 2013, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2013, which included signed Certifications by Defendants Miller and Brown, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting. The report reiterated the Company's previously announced quarterly financial results and financial position.  Polycom reported total operating expenses of $200 million, including general and administrative expenses of $24 million.  (Q1 2013 10-Q at 4).  The 10-Q also warned that Polycom's success will depend on its ability to retain its highly qualified senior executives, and that executive departures could cause disruption to the business.  The 10-K

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at its helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. As new hires assess their areas of responsibilities and define their organizations, it will likely result in disruption to the business and additional organizational changes or restructuring actions and charges. Future changes to our executive and senior management teams, including new executive hires or departures, could cause disruption to the business and have an impact on our ability to execute successfully in future periods, while these operational areas are in transition. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

(*Id*. at 53).

99.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 73.

## THE TRUTH BEGINS TO EMERGE

100.     On July 23, 2013, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2013. In that July 23, 2013 press release the Company disclosed for the first time that:

> On July 19, 2013, Mr. Andrew M. Miller submitted a letter to the Board of Directors (the "Board") of the Company resigning from the positions of Chief Executive Officer and President and from the Board, effective immediately on such date. Mr. Miller will continue as a non-executive employee of the Company until August 15, 2013.
>
> *            *            *
>
> On July 17, 2013, the **Audit Committee of the Board completed a review of certain of Mr. Miller's expense submissions. The Audit Committee found certain irregularities in these submissions**. At the conclusion of the review, **Mr. Miller accepted responsibility** and submitted the letter referred to in Item 5.02. The amounts involved did not have a material impact on the Company's previously reported financial statements for any period.

(emphasis added).

101.   The same day, during an earnings call announcing the Company's Q2 2013 financial results, analysts questioned Polycom's "organizational stability" in light of Miller's forced resignation, as Miller "had a very loyal following at the company."  (Polycom Q2 2013 Earnings Call, 7/23/2013).  Polycom's interim CEO, Kevin Parker, openly acknowledged that "[t]his is obviously a tough set of circumstances" and is "undoubtedly, a significant change." (*Id.*)

102.   On this news, shares of Polycom fell $1.68 cents, or over 15% percent, to $9.50 per share on July 24, 2013, on volume of over 11 million shares. This decline wiped out over $275 million in market value.

103.   Analysts reacted negatively to Miller's departure.  For example, RBC Capital Markets downgraded Polycom to "underperform" and concluded that "[t]he management transition presents yet another factor of uncertainty in the company's near-term direction." (RBC Capital Markets report, July 24, 2013).   PiperJaffray also downgraded Polycom to "underweight" and lamented that "[t]he departure of CEO Andy Miller…raises red flags and we believe management credibility (at all executive levels) comes into question."  Indeed, PiperJaffray "view[ed] the departure of Mr. Miller as a longer term headwind for a company that was already struggling to find direction."  (PiperJaffray report, July 24, 2013).  Janney Capital Markets similarly warned that "Miller was an execution-focused CEO, who spearheaded the recent expansion in direct selling model and recruited most of the current sales leadership team," therefore "[w]ith pressure on the sales force still high…sales turnover is a real threat."  (Janney Capital Markets report, July 24, 2013).  Likewise, Wedbush cautioned that Miller's resignation introduces risks and "heightens investor skepticism."  "Given Mr. Miller's role in shaping senior management, we also have concerns regarding the potential for

additional management upheaval and sales force attrition.  We note that EVP of Global Sales Tracey Newell, appointed by Mr. Miller, has also indicated she will be leaving the firm in August." (Wedbush Equity Research, July 24, 2013).

104.   The SEC commenced an investigation into the Audit Committee's review of Miller's expense submissions and his resignation.  That investigation is ongoing.  To date, Polycom squandered over $3 million in connection with the SEC investigation.

105.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

106.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading or omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Defendant Miller's expense reports, their control over the materially false and misleading misstatements, and/or their associations with the Company, which made them privy to confidential information concerning the misstatements and/or omissions alleged herein, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew of and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.

107.     As detailed in ¶¶ 48-53 above, Defendants Kourey and Brown reviewed and approved Miller's expenses.

108.     The Individual Defendants were each motivated to maintain their lucrative jobs, and increase their compensation over their normal salary and their personal net worth. Polycom's executive compensation had three components: base salary, short-term cash incentives, and long-term equity-based incentives.  Short-cash incentives were offered "[t]o focus each executive officer on the importance of achieving [Polycom's] goals" of "meeting and exceeding [the Company's] operating plan and maximizing [the Company's] delivery of rewards to its stockholders and employees."  (Proxy filed 4/19/2013 at 45-46, incorporated by reference in 2012 10-K).  Keeping Polycom's stock at artificially inflated prices enabled Defendants to enhance their net worth.

109.     The Individual Defendants received handsome compensation packages.  For example, in 2011 Miller pocketed over $5 million, including a base salary of $727,778, a bonus of $150,000, and stock awards of $3,270,901; and Kourey received over $1.5 million, including a base salary of 454,720 and stock awards of $732,325.  In 2012, Miller received over $7 million, including a base salary of $819,949 and stock awards of $6,166,576; and Brown pocketed more than $8 million, including a salary of $519,542, a bonus of $375,000, and stock awards of $7,791,816.  (*Id*. at 58).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

110.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Polycom securities during the Class Period (the "Class"), and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of

the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

111.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Polycom securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Polycom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

112.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

113.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

114.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Polycom;

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

- whether the Individual Defendants caused Polycom to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Polycom securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

116.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Polycom securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Polycom securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

---

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

117.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

### CAUSATION AND ECONOMIC LOSS

118.    As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements and/or omitted material information about Defendant Miller's expense reports and Polycom's financial and business practices. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Polycom, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and misleading statements during the Class Period were widely disseminated to the securities markets, investment analysts, and to the investing public, and resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices. Moreover, upon the revelation to the market and the investing public of the truth concerning Defendant Miller's falsified expense reports and its forced resignation, the market price of Polycom's shares declined substantially, resulting in significant damages to Plaintiff and other shareholders.

119.    Had the truth about Polycom been revealed to the market earlier, Plaintiff and the Class would not have purchased Polycom's common stock or would have purchased the stock only at dramatically lower prices.

120.    When the truth about Polycom was finally revealed on July 23, 2013, as detailed above in ¶¶ 100-101, a significant portion of the artificial inflation that had been caused by Defendants' materially false and misleading statements and omissions was eliminated from the

price of Polycom's common stock, causing significant losses to Plaintiff and the Class. *See* ¶ 102.

121.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

122.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the Company's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period (ranging from hundreds of thousands to millions of shares per week);

- as a regulated issuer, the Company filed with the SEC periodic reports during the Class Period;

- the Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company was followed by multiple securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; these reports were publicly available and entered the public marketplace;

- numerous FINRA member firms were active market-makers in the Company's stock at all times during the Class Period; and

- unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

123.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

124.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

125.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

126.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Polycom securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Polycom securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

127.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the

quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Polycom securities.  Such reports, filings, releases and statements were materially false and misleading in that they misrepresented the truth about and/or failed to disclose material adverse information related to Miller's fraudulent submissions of expense reports and Polycom's stability as a result of the fraud committed at the highest level of management,  Miller's non-compliance with Polycom's Code of Business Ethics and Conduct, the Company's financial reporting, and the internal controls over its business and financial operations.

128.    By virtue of their positions at Polycom, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

129.    Further information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

130.    As the Chief Executive Officer of Polycom and the person filling and submitting the expense reports for approval, Defendant Miller had intimate knowledge of the details of his

false expense submissions.  The remaining Individual Defendants received, reviewed and/or approved Miller's expense reports.

131.   The Individual Defendants also are liable both directly and indirectly for the wrongs complained of herein.  Because of their position of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Polycom.  As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Miller's expense submissions and Polycom's stability as a result of the fraud committed at the highest level of management, Miller's non-compliance with Polycom's Code of Business Ethics and Conduct, the Company's financial reporting, and the internal controls over the Company's business and financial operations.

132.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Polycom securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Defendant Miller's expense submissions and his non-compliance with Polycom's Code of Business Ethics and Conduct, Polycom's financial reporting, and the internal controls over the Company's business and financial operations, which were concealed and/or misrepresented by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Polycom securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

133.   During the Class Period, Polycom securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false

and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Polycom securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Polycom securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Polycom securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

134.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and misleading financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against the Individual Defendants)

136.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137.    During the Class Period, the Individual Defendants participated in the operation and management of Polycom, and conducted and participated, directly and indirectly, in the conduct of Polycom's business affairs.  Because of their senior positions and their roles in preparing, receiving, reviewing and/or approving Defendant Miller's expense reports, the Individual Defendants knew the adverse non-public information about Polycom' published representations.

138.    As officers and/or directors of a publicly-owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Defendant Miller's expense submissions and his non-compliance with Polycom's Code of Business Ethics and Conduct, Polycom's financial reporting, and the internal controls over the Company's business and financial operations, and to correct promptly any public statements issued by Polycom which had become materially false or misleading.

139.    Because of their position of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Polycom disseminated in the marketplace during the Class Period concerning Defendant Miller's expense submissions and his non-compliance with Polycom's Code of Business Ethics and Conduct, Polycom's financial results, and the internal controls over its business and financial operations. Throughout the Class Period, the Individual Defendants exercised this power and authority to cause Polycom to engage in the wrongful acts complained of herein. The Individual Defendants therefore were a "controlling person" of Polycom within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Polycom securities.

---

140.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Polycom.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   February 24, 2014

Respectfully submitted,

**POMERANTZ LLP**

By: */s/Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted pro hac vice)
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (#134180)
Michael Goldberg (#188669)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS