1  PAUL T. FRIEDMAN (CA SBN 98381)
   PFriedman@mofo.com
2  PHILIP T. BESIROF (CA SBN 185053)
   PBesirof@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California 94105-2482
   Telephone: 415.268.7000
5  Facsimile: 415.268.7522

6  Attorneys for Defendant
   ANDREW M. MILLER
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12 | MARK NATHANSON, Individually and on      | Case No. 3:13-cv-03476-SC
   | Behalf of All Others Similarly Situated,  |
13 |                                           |
14 |                    Plaintiff,             | **DEFENDANT ANDREW M. MILLER'S
   |                                           | NOTICE OF MOTION AND MOTION TO**
15 |        v.                                 | **DISMISS PLAINTIFF'S FIRST AMENDED
   |                                           | COMPLAINT; MEMORANDUM OF**
16 | POLYCOM, INC., ANDREW M. MILLER,          | **POINTS AND AUTHORITIES IN
   | MICHAEL R. KOUREY, and ERIC F.            | SUPPORT THEREOF**
17 | BROWN,                                    |
18 |                    Defendants.            | Hearing Date:  October 24, 2014
   |                                           | Hearing Time:  10:00 a.m.
19 |                                           | Judge:         Hon. Samuel Conti
   |                                           | Courtroom:     1, 17th Floor
20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on Friday, October 24, 2014, at 10:00 a.m., or at such other time as the matter may be heard, in the courtroom of the Honorable Samuel Conti, located at 450 Golden Gate Avenue, San Francisco, California, Courtroom 1, 17th Floor, defendant Andrew Miller will, and hereby does, move to dismiss Plaintiff's First Amended Complaint ("Complaint") for Violation of the Federal Securities Laws under Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as the Private Securities Litigation Reform Act of 1995 ("Reform Act"). The Complaint should be dismissed in its entirety because it falls far short of the stringent standards for pleading securities fraud under the Reform Act. *See* Fed. R. Civ. P. 9(b), 12(b)(6).

This Motion is based upon this Notice and the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice, the Declaration of Philip T. Besirof in Support of Mr. Miller's Motion to Dismiss, the reply brief that will be filed per the briefing schedule, the papers on file in the action, the argument of counsel at the hearing, and such other matters as may be considered by the Court.[1]

---

[1] Throughout this Motion, Plaintiff's Complaint is cited by paragraph number, ¶ --. Philip Besirof's Declaration is cited by the Declaration's paragraph number, Decl. ¶ --. Exhibits to the Besirof Declaration are cited by exhibit number, Ex. --. As set forth in the Request for Judicial Notice, the Court may consider these exhibits in deciding this Motion without converting it into a motion for summary judgment.

1

## ISSUES TO BE DECIDED

2      1.      Should Plaintiff's section 10(b) claim be dismissed because it does not plead with

3  particularity that any statements or omissions were materially false or misleading?

4      2.      Should Plaintiff's section 10(b) claim be dismissed because it does not adequately

5  plead loss causation?

6      3.      Should Plaintiff's section 10(b) claim be dismissed because it does not plead with

7  particularity any facts giving rise to a strong inference that Mr. Miller made any false statements

8  or omissions with the intent to defraud investors?

9      4.      Should Plaintiff's section 20(a) claim be dismissed because it does not plead an

10  underlying violation of federal securities law?

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2
**Page**

3 NOTICE OF MOTION AND MOTION ......................................................................... i

4 ISSUES TO BE DECIDED ...................................................................................... ii

5 TABLE OF AUTHORITIES ..................................................................................... v

6 INTRODUCTION .................................................................................................... 1

7 FACTUAL BACKGROUND AND ALLEGATIONS ..................................................... 2

8       A.     Polycom Announces Weak Financial Results and Outlook and
9                Mr. Miller's Departure on the Same Day in the Same Press Release. ................... 2

      B.     Polycom Reconfirms that Any Irregularities in Mr. Miller's
10                Expense Reports Did Not Materially Impact the Company's
11                Financial Statements. ...................................................................................... 3

12       C.     Plaintiff's First Amended Complaint Alleges that Defendants
               Defrauded Investors by Improperly Reimbursing Personal
13                Expenses. ....................................................................................................... 4

14 LEGAL STANDARDS ............................................................................................ 6

15       A.     Rule 12(b)(6) ................................................................................................. 6

16       B.     Section 10(b) .................................................................................................. 6

17       C.     Rule 9(b) and the Reform Act ......................................................................... 7

18       D.     Section 20(a) .................................................................................................. 7

19 ARGUMENT ......................................................................................................... 7

20 I.     PLAINTIFF FAILS TO PLEAD A SECTION 10(b) CLAIM. .................................. 7

21       A.     Claims for Mismanagement and Breaches of Fiduciary Duty Are
               Not Actionable as Securities Fraud. ................................................................ 7

22       B.     Plaintiff Fails to Plead a Material Misstatement or Omission. .......................... 8

23            1.     The Alleged Omissions Are Not Actionable Because
24                   Plaintiff Fails to Plead that They Were Material. ................................... 8

25                   a.     No factual allegations contradict Polycom's conclusion
                    Mr. Miller's expenses were immaterial. ...................................... 10

26                   b.     Statements by confidential witnesses who did not work at
                    Polycom during the class period are not based on personal
27                     knowledge. ................................................................................ 11

28                   c.     Statements by confidential witnesses consisting of hearsay,
                    gossip, and innuendo are not reliable. ........................................ 12

# TABLE OF CONTENTS

**Page**

1

        d.    Other statements by confidential witnesses are unreliable and fail to support Plaintiff's claim.................................................. 12

2

3

        e.    The failure to allege facts demonstrating that Mr. Miller's allegedly false expense reports constituted a material omission is fatal to Plaintiff's case.................................................. 13

4

    2.    Polycom's Alleged Misstatements About Its Operating Expenses Are Not Actionable Because There Are No Factual Allegations that Mr. Miller Was Reimbursed for Personal Expenses in Material Amounts. ................................. 14

5

6

    3.    Alleged Misstatements About Polycom's Internal Controls Are Not Actionable Under Federal Securities Laws.................... 14

7

8

    4.    Defendants' Alleged Misstatements About Polycom's Code of Business Ethics and Conduct Fail Because Defendants Did Not Make False Statements, and Ethics Code Violations Are "Aspirational." .................................................................. 15

9

10

    5.    Defendants' Alleged Misstatements about the Risks of Mr. Miller's Resignation Are Not Actionable Because They Were Not False............................................................................ 16

11

12

  C.    Plaintiff Fails to Plead Loss Causation Because Disappointing Financial Results, Not a Corrective Disclosure that Revealed the "Truth" About a Past "Fraud," Caused the Alleged Losses............................... 17

13

14

    1.    Plaintiff Has Not Pled that the Disclosure of Allegedly Fraudulent Practices Was Revealed to the Market and "Caused" Resulting Losses. ..................................................... 18

15

16

    2.    The July 23, 2013 Press Release and Earnings Call Did Not Reveal the Material Falsity of Any Prior Statement. .............................. 22

17

18

  D.    Plaintiff Fails to Plead Particularized Facts Giving Rise to a "Strong Inference" that Mr. Miller Intended to Mislead Investors. ................................. 24

19

II.     PLAINTIFF FAILS TO PLEAD A SECTION 20(a) CLAIM. ...................................... 25

20

CONCLUSION.................................................................................................... 25

21

ECF ATTESTATION ............................................................................................ 26

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

3

**Page(s)**

CASES

4

*60223 Trust v. Goldman, Sachs & Co.*,

5

540 F. Supp. 2d 449 (S.D.N.Y. 2007)................................................................. 22

6

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

7

133 S. Ct. 1184 (2013)............................................................................... 6, 7

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,

8

505 F. Supp. 2d 662 (D. Colo. 2007)................................................ 8, 15, 16, 25

9

*Ashcroft v. Iqbal*,

10

556 U.S. 662 (2009)..................................................................................... 6

11

*Berson v. Applied Signal Tech., Inc.*,

527 F.3d 982 (9th Cir. 2008).......................................................................... 8

12

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,

13

964 F. Supp. 2d 1128 (N.D. Cal. 2013) ................................................... *passim*

14

*City of Philadelphia v. Fleming Cos., Inc.*,

15

264 F.3d 1245 (10th Cir. 2001)...................................................................... 25

16

*Dura Pharms., Inc. v. Broudo*,

544 U.S. 336 (2005).......................................................................... 6, 18, 21

17

*Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*,

18

615 F. Supp. 2d 218 (S.D.N.Y. 2009)............................................................. 17

19

*Gavish v. Revlon, Inc.*,

20

No. 00-CIV-7291(SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ................. 8

21

*Glenbrook Capital Ltd. P'ship v. Kuo*,

525 F. Supp. 2d 1130 (N.D. Cal. 2007) ........................................................... 24

22

*Higginbotham v. Baxter Int'l, Inc.*,

23

495 F.3d 753 (7th Cir. 2007)......................................................................... 13

24

*In re Commtouch Software Ltd. Sec. Litig.*,

25

C 01-00719 WHA, 2002 WL 31417998 (N.D. Cal. July 24, 2002) ................ 11, 12, 13

26

*In re Daou Sys., Inc., Sec. Litig.*,

411 F.3d 1006 (9th Cir. 2005)..................................................................... 11, 23

27

*In re The First Marblehead Corp. Sec. Litig.*,

28

639 F. Supp. 2d 145 (D. Mass. 2009) .............................................................. 15

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ............................................................... 9, 14

*In re Foundry Networks, Inc. Sec. Litig.*,
No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ................. 16

*In re FoxHollow Techs., Inc., Sec. Litig.*,
C 06-4595 PJH, 2008 WL 2220600 (N.D. Cal. May 27, 2008) ............................ 17

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................................................. 24

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) .......................................................... 23, 24

*In re Merrill Lynch & Co. Research Reports Secs. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...................................................... 18, 21, 22

*In re Newell Rubbermaid Inc. Sec. Litig.*,
No. 99-C-6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .......................... 9, 14

*In re Nvidia Corp. Sec. Litig.*,
No. 08-CV-04260-RS, 2010 U.S. Dist. LEXIS 114230 (N.D. Cal. Oct. 19, 2010)............... 21

*In re PetSmart, Inc. Sec. Litig.*,
61 F. Supp. 2d 982 (D. Ariz. 1999)...................................................................... 14

*In re Redback Networks, Inc. Sec. Litig.*,
No. C 03-5642 JF (HRL), 2007 WL 963958 (N.D. Cal. Mar. 30, 2007).............................. 18

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)............................................................................... 25

*In re United Telecomms., Inc., Sec. Litig.*,
781 F. Supp. 696 (D. Kan. 1991) .......................................................................... 8

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012)................................................................................. 7

*Krainski v. State ex rel. Bd. of Regents*,
616 F.3d 963 (9th Cir. 2010)................................................................................. 6

*Limantour v. Cray Inc.*,
432 F. Supp. 2d 1129 (W.D. Wash. 2006)...................................................... 11, 12

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)...................................................... 17, 18, 22, 24

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013).......................................................................... 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .................................................................................. 25

*Panter v. Marshall Field & Co.*,
  646 F.2d 271 (7th Cir. 1981) ..................................................................................... 7

*Parnes v. Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) ................................................................................ 8, 14

*Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009) ....................................................................... 15

*Scandlon v. Blue Coat Sys.*,
  No. C 11-4293 RS, 2013 WL 5313168 (N.D. Cal. Sept. 23, 2013) ................................. 22, 23

*SEC v. Kovzan*,
  807 F. Supp. 2d 1024 (D. Kan. 2011) .................................................................... 15

*Shuster v. Symmetricon, Inc.*,
  No. 94-20024 RMW, 1997 WL 269490 (N.D. Cal. Feb. 25, 1997) ........................................ 9

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
  551 U.S. 308 (2007) ........................................................................................ 24, 25

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ........................................................................................ 8, 10

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) ...................................................................... 24

*Wozniak v. Align Tech., Inc.*,
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................................... 17

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................................. *passim*

**STATUTES**

15 U.S.C.
  § 78t(a) ....................................................................................................... 25
  § 78u-4(b)(2) ................................................................................................ 24
  § 78u-4(b)(4) ................................................................................................ 17

**OTHER AUTHORITIES**

Fed. R. Civ. P.
  Rule 9(b) ....................................................................................................... 7
  Rule 12(b)(6) .................................................................................................. 6

**INTRODUCTION**

Plaintiff seeks to assert securities fraud claims based on allegations amounting to nothing more than purported corporate mismanagement and breaches of fiduciary duty.  Plaintiff alleges that:  Polycom's former CEO, Andrew Miller, sought reimbursement for certain personal expenses as business expenses; the Company's past and current CFOs reviewed and approved Mr. Miller's expense reports; and the Company's internal controls were deficient because they did not timely detect or prevent these payments.

Whatever these allegations may say about inaccuracies in Mr. Miller's expense reports, the review and approval of those expenses, or the efficacy of Polycom's internal controls, Plaintiff cannot conjure securities fraud claims out of them.  *Plaintiff's allegations give rise, at most, to potential claims by or on behalf of Polycom—not direct claims by a putative shareholder class for damages to the shareholders themselves.*  Indeed, other Polycom shareholders assert these very same allegations in derivative suits before this Court and California Superior Court seeking to recover on behalf of the Company.  Claims predicated on allegations of mismanagement and breaches of fiduciary duty, however, are not actionable under the federal securities laws.

Moreover, Plaintiff fails to allege any facts that, if proven, would demonstrate that the alleged expense account issues were material to Polycom's financial reporting.  To the contrary, and as Plaintiff himself acknowledges, Polycom informed its investors that the Audit Committee investigated this issue and repeatedly concluded, including as recently as in the Company's proxy filed the same day as this Motion, April 25, 2014, that "the amounts ***did not*** have a material impact on the Company's previously reported consolidated financial statements for any period because Mr. Miller's total amount of expenses in each period were immaterial to Polycom's financial statements."  The non-disclosure of immaterial amounts of personal expenses cannot, as a matter of law, give rise to a claim for defrauding investors under federal securities laws. Plaintiff's conclusory allegation (supported by *no* factual allegations) that Defendants failed to disclose that the Company reimbursed Mr. Miller for personal expenses "in material amounts" does not salvage this case.

1    Plaintiff has not pled with particularity any materially misleading misrepresentation or

2    omission to the market (as opposed to immaterial inaccuracies in Mr. Miller's internally

3    submitted expense reports) that would have affected a reasonable investor's decision to buy or

4    sell Polycom stock.

5    Plaintiff also fails adequately to allege that any purported wrongdoing caused a drop in the

6    Company's share price.  Plaintiff ignores that Polycom suffered steep drops in the days

7    immediately following several of the Company's press releases and SEC filings announcing its

8    financial results.  Plaintiff also ignores that, in the disclosures that he claims revealed Defendants'

9    "fraud" and caused the losses, Polycom reported a decline in year-over-year revenues and

10   revealed lowered revenue guidance for the following quarter that was "well below the consensus

11   estimate," in addition to Mr. Miller's resignation.  *Plaintiff makes no attempt to address the*

12   *market impact of Polycom's disappointing financial results, revenue guidance well below*

13   *analysts' expectations, and negative outlook for Polycom's future prospects.*  The only plausible

14   inference from the relevant disclosures, however, is that the market reacted negatively to

15   Polycom's diminished revenues and prospects—just as it had throughout the class period.

16   Finally, Plaintiff fails to plead specific facts (not rumor, hearsay, gossip, or innuendo)

17   demonstrating a "strong inference" that Mr. Miller made statements *to the market* with the intent

18   to deceive investors and artificially inflate the price of Polycom's stock.

19   Plaintiff's Complaint should be dismissed for failure to state a claim for violations of the

20   federal securities laws.

**FACTUAL BACKGROUND AND ALLEGATIONS**

21

22   A.    **Polycom Announces Weak Financial Results and Outlook and Mr. Miller's
           Departure on the Same Day in the Same Press Release.**

23

24   On July 23, 2013, Polycom issued a press release disclosing its weak financial results for

25   the second quarter of 2013.  (Ex. 2.)  The Company announced a 4% drop in year-over-year

26   revenue and a 1.4% drop in year-over-year gross profits; the Company also issued earnings

27   guidance for the third quarter of 2013 *below* those already disappointing results and "well below"

28   analysts' "consensus estimate."  (Exs. 2, 11.)  *Analysts were quick to point out that this marked*

1    *the fifth time in the last six quarters that Polycom had reduced its forward outlook, and that the*

2    *Company's non-GAAP gross margin hit a three-year low*.  (Exs. 11, 12.)  The next day, when

3    "weakness in technology shares dragged . . . the Nasdaq into negative territory," Polycom's share

4    price fell by 15% ($1.68) to $9.50 per share.[2]  (¶ 102; Decl. ¶ 16; Exs. 14-15.)

5          In the same press release, Polycom announced that Mr. Miller had resigned from his

6    positions as Chief Executive Officer, President, and a member of its Board of Directors.  (¶ 66.)

7    Polycom explained that Mr. Miller tendered his resignation after Polycom's Audit Committee

8    found "certain irregularities" in his expense submissions.  (*Id.*)  Mr. Miller accepted responsibility

9    for the irregularities, even though the Committee determined that "[t]he amounts involved did not

10   have a material impact on the Company's current or previously reported financial statements for

11   any period."  (¶ 100.)  Mr. Miller entered into a separation agreement in which he agreed to assist

12   Polycom during a transition period.  (Ex. 3 at 2.)

13         Counsel for Plaintiff immediately filed a class action complaint for alleged violations of

14   federal securities laws, claiming that investors were defrauded by Polycom, Mr. Miller, and other

15   individual defendants (collectively, "Defendants").[3]  (July 26, 2013, ECF No. 1.)  Several other

16   plaintiffs filed derivative complaints in federal and state court, asserting claims for breach of

17   fiduciary duty, unjust enrichment, and corporate waste, arising out of the same operative facts.[4]

18    **B.    Polycom Reconfirms that Any Irregularities in Mr. Miller's Expense Reports
            Did Not Materially Impact the Company's Financial Statements.**
19

20         In September 2013, more than five months before the Amended Complaint was filed,

21   Polycom confirmed once again that any irregularities in Mr. Miller's expense reports did not

22

23         [2] This was $1.47 higher than Polycom's share price a year earlier, when it fell to $8.03
     after the Company announced results for the second quarter of 2012.  (Decl. ¶ 17; Ex. 14.)

24         [3] The original complaint named Mr. Miller, Eric Brown, and Sayed Darwish as the
     individual defendants.  (ECF 1.)  The operative complaint does not name Mr. Darwish, but adds

25   Michael Kourey, Polycom's former CFO, as a defendant.  (*E.g.*, ¶ 25.)

          [4] The federal derivative action, *In re Polycom, Inc. Derivative Litigation*, Lead Case No.
26   3:13-cv-03880-SC, consolidated two derivative complaints: *Saraceni v. Miller, et al.*, No. 3:13-
     cv-03880-SC, and *Donnelly v. Miller, et al.*, No. 5:13-cv-04810-PSG.  The state derivative action,

27   *In re Polycom, Inc. Derivative Shareholder Litig.*, No. 1-13-CV-256608 (Cal. Super. Ct.)
     (Kirwan, J.), consolidated two additional derivative complaints: *Ware v. Miller, et al.*, No. 1-13-

28   CV-256608, and *Clem v. Miller, et al.*, No. 1-13-CV-257664.

1    materially impact the Company's previously filed financial statements. (Ex. 4.) The Company's

2    conclusion was based on a further review of Mr. Miller's expense submissions dating back to

3    2010. (¶ 66; Ex. 4.) Although Polycom believed that some of Mr. Miller's personal expenses

4    had been reimbursed and accounted for as business expenses, it "continue[d] to conclude that the

5    amounts involved did not have a material impact on the Company's previously reported financial

6    statements." (Ex. 4.)

7       On April 25, 2014, Polycom again confirmed that reimbursements did not materially

8    impact the Company's previously filed financial statements. (Ex. 5 at 59-60.) Independent

9    advisors retained by the Audit Committee determined that $77,000 in expenses were either

10    "personal or most likely personal," and that it was inconclusive whether (or not) another

11    $116,000 in expenses were personal. (*Id.*) Based on these findings, the Company concluded:

12
13
14

> While we cannot determine the precise amount of personal expenses that Mr. Miller improperly submitted as business expenses, *the amounts did **not have a material impact** on Polycom's previously reported consolidated financial statements for any period because **Mr. Miller's total amount of expenses** in each period **were immaterial** to Polycom's financial statements*.

15    (*Id.* at 60 (emphases added).)

16      **C.**    **Plaintiff's First Amended Complaint Alleges that Defendants Defrauded Investors by Improperly Reimbursing Personal Expenses.**

17

18       Notwithstanding Polycom's determinations that any irregularities in Mr. Miller's expenses

19    were immaterial to the Company's previously filed financial statements, Plaintiff's Amended

20    Complaint asserts two claims for securities fraud predicated on the allegation that these expenses

21    were, in fact, material. According to the Complaint, Mr. Miller submitted "personal expenses as

22    business expenses," and Polycom's Chief Financial Officers, Defendants Kourey and Brown,

23    approved reimbursements in "material amounts." (*E.g.*, ¶¶ 3, 16, 51, 107.) Plaintiff also alleges

24    that Polycom had weak internal controls, which "were not effective in preventing or timely

25    detecting a material error in the financial statements, as well as a material misappropriation of the

26    Company's assets." (¶ 8.)

27       Plaintiff's allegations are purportedly corroborated by several unidentified confidential

28    witnesses who imply that Mr. Miller was reimbursed for personal expenses as business expenses.

(¶ 5.)  None of these witnesses identifies the *amount* of any personal expenses or says how they relate to Polycom's financial statements.  (*See* ¶¶ 48-65.)

On the basis of the non-disclosure of allegedly material expense reimbursements, Plaintiff alleges that Defendants made five types of materially misleading statements or omissions in Polycom's press releases and SEC Forms 10-Q and 10-K between January 20, 2011, and July 23, 2013.

1.      Alleged False Expense Reports:  Plaintiff alleges that Defendants made omissions of material fact by failing to disclose that Polycom reimbursed Mr. Miller for certain personal expenses in "material amounts."  (*See* ¶¶ 16, 73, 84, 96, 99.)

2.      Alleged False Operating Expenses:  Plaintiff alleges that Defendants made misstatements of material fact regarding Polycom's reported operating expenses that allegedly included (and did not disclose) the Company's reimbursement of Mr. Miller for certain personal expenses.  (*See* ¶¶ 6, 69, 71, 73-80, 82, 84-91, 94, 96-99.)

3.      Alleged Ineffective Internal Controls:  Plaintiff alleges that Defendants made misstatements of material fact regarding the effectiveness of Polycom's internal controls over its financial reporting, which were intended "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . . ."  (*See* ¶¶ 8, 70, 73, 75, 77, 79, 81, 84, 86, 88, 90, 93, 96, 98-99.)  Defendants' statements were allegedly false because the controls did not prevent or detect reimbursement of personal expenses, leading to "a material error" in financial statements and a "material misappropriation" of assets.  (¶ 8.)

4.      Alleged Violations of Polycom's Ethics Code:  Plaintiff alleges that Defendants made misstatements of material fact regarding Mr. Miller's representation of his "understanding of, and commitment to, the standards and policies contained in Polycom's Code of Business Ethics and Conduct" in his offer letter, as well as Polycom's incorporation by reference of its Ethics Code in its Form 10-K filings.  (*See* ¶¶ 9, 44-47, 72, 73, 83, 84, 95, 96.)  The statement in Mr. Miller's 2009 offer letter was allegedly false because he is alleged to have later violated the Code, and the Company's incorporation of the Code by reference in its SEC filings was allegedly misleading because it implied that there were no violations.  (¶ 9.)

5.      Alleged Risks of Termination:  Plaintiff alleges that Defendants made omissions of material fact when they disclosed that there was a risk that executives might leave the Company, thereby harming the business, because they did not disclose that there was a "significant risk" that Mr. Miller would leave.  (¶¶ 10, 71, 73, 75, 77, 79, 82, 86, 88, 90, 94, 98.)  For the same reason, Plaintiff alleges that Mr. Miller misstated a material fact when he said that "right now," on February 13, 2013, he was "planning on being here for quite a period of time."  (¶ 92.)

These five categories of allegedly misleading statements or omissions—all of which are predicated on Polycom's alleged reimbursements of personal expenses in material amounts—form the basis for Plaintiff's claims under Sections 10(b) and 20(a), brought on behalf of a putative class of shareholders who purchased stock between January 20, 2011, and July 23, 2013.

## LEGAL STANDARDS

### A.      Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter to state a facially plausible claim to relief."  *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 972 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (internal quotation omitted).

### B.      Section 10(b)

Section 10(b) of the Securities Exchange Act prohibits fraudulent acts or omissions in connection with the purchase or sale of a security in violation of federal laws.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  To state a claim under section 10(b), a complaint must adequately allege: (1) a material misrepresentation or omission made by defendant; (2) scienter; (3) a connection between the false misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[5]  *See Zucco Partners, LLC v.*

---

[5] Plaintiff alleges that he will seek to satisfy reliance based "upon the presumption of reliance established by the fraud-on-the-market doctrine."  (¶ 116; *see also* ¶¶ 117, 122-23.)  It is unclear, however, whether the fraud-on-the-market doctrine remains viable.  As acknowledged in *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013), there are serious questions about its future status.  *See id.* at 1204 (Alito, J., concurring), 1208 n.4 (Thomas, J., dissenting).  Although the Court declined to address this issue as it was not properly before it in

1    *Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009).

2        **C.     Rule 9(b) and the Reform Act**

3        A complaint alleging securities fraud under section 10(b) must also satisfy the heightened

4    pleading requirements under Rule 9(b) and the Reform Act.  *See In re VeriFone Holdings, Inc.*

5    *Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (stating that these pleading requirements "present

6    no small hurdle for the securities fraud plaintiff").

7        **D.     Section 20(a)**

8        Section 20(a) of the Exchange Act makes certain "controlling" individuals liable for

9    violations of section 10(b).  *See Zucco*, 552 F.3d at 990.  "Section 20(a) claims may be dismissed

10   summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)."  *Id.*

11                              **ARGUMENT**

12   **I.    PLAINTIFF FAILS TO PLEAD A SECTION 10(B) CLAIM.**

13       **A.     Claims for Mismanagement and Breaches of Fiduciary Duty Are Not
               Actionable as Securities Fraud.**
14

15       Plaintiff's allegations regarding expense irregularities, and any resulting harm to Polycom,

16   do not state a claim for securities fraud.  Simply put, mismanagement and breaches of fiduciary

17   duty do not violate the federal securities laws.  *See  Cement & Concrete Workers Dist. Council*

18   *Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1138 (N.D. Cal. 2013) (stating that,

19   absent some type of material deception not alleged here, breaches of fiduciary duty are not

20   actionable as securities fraud).  Attempts such as Plaintiff's to contort breach of fiduciary duty

21   allegations into securities fraud claims have been repeatedly rejected.  *See, e.g.*, *Panter v.*

22   *Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981) ("[C]ourts have consistently held that

23   since a shareholder cannot recover under 10b-5 for a breach of fiduciary duty, neither can he

24   'bootstrap' such a claim into a federal securities action . . . ."); *Cement & Concrete Workers*,

25   964 F. Supp. 2d at 1138 (granting motion to dismiss because "Defendants' alleged conduct did

26   not include 'actionable omissions' within the meaning of the Exchange Act, even if it could have

27   

28   *Amgen, id.* at 1197 n.6, it has now been squarely presented in *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317, in which the Court heard oral argument on March 5, 2014.

1  given rise to state corporate law remedies"); *Andropolis v. Red Robin Gourmet Burgers, Inc.*,

2  505 F. Supp. 2d 662, 683 (D. Colo. 2007) (dismissing claim because "Plaintiff may not bootstrap

3  his internal mismanagement claim" into a securities action); *In re United Telecomms., Inc., Sec.*

4  *Litig.*, 781 F. Supp. 696, 700 (D. Kan. 1991) (same).  This Court should follow suit and dismiss

5  Plaintiff's Complaint.

6  **B.      Plaintiff Fails to Plead a Material Misstatement or Omission.**

7  Statements or omissions are actionable under federal securities laws only if they are

8  misleading and material.  *See Cement & Concrete Workers*, 964 F. Supp. 2d at 1138.  A statement

9  or omission is *misleading* "if it would give a reasonable investor the 'impression of a state of

10 affairs that differs in a material way from the one that actually exists.'"  *Berson v. Applied Signal*

11 *Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation omitted).  A statement or omission is

12 *material* only when there is a "substantial likelihood that the disclosure of the omitted fact would

13 have been viewed by the reasonable investor as having significantly altered the 'total mix' of

14 information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

15 Under the Reform Act, a complaint must plead the falsity of any allegedly misleading

16 statement or omission with particularity.  *See Zucco*, 552 F.3d at 990-91.  This heightened

17 pleading standard requires plaintiffs to "specify each statement alleged to have been misleading

18 [and] the reason or reasons why the statement is misleading."  *Id.* (citation omitted).

19 None of Plaintiff's five categories of alleged misstatements or omissions is actionable.

20 **1.      The Alleged Omissions Are Not Actionable Because Plaintiff Fails to**
21 **Plead that They Were Material.**

22 The failure to disclose Polycom's alleged reimbursement of certain personal expenses

23 does not constitute a material omission unless the amounts reimbursed were material to the

24 Company.  *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (holding that

25 "Defendants' alleged overstatement of assets by $6.8 million was immaterial as a matter of law"

26 because it "represented only 2% of [the company's] total assets"); *Gavish v. Revlon, Inc.*,

27 No. 00-CIV-7291(SHS), 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (dismissing

28 complaint alleging financial misstatements because it failed "to even attempt to approximate the

1    magnitude or degree of those misstatements in relation to [the company's] total financial

2    picture"); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 895 (W.D.N.C. 2001)

3    (dismissing claim "as a matter of law" because the alleged misstatement of earnings ($79 million)

4    amounted to only 2% of the company's operating earnings); *In re Newell Rubbermaid Inc. Sec.*

5    *Litig.*, No. 99-C-6853, 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) (dismissing claim for

6    alleged misstatements because the "[u]ndisclosed expenses of $40 million over this period

7    amount to nothing more than pocket change when compared with [the company's] overall sales

8    expenses—less than 1% of the total," and less than 10% of the company's before-tax income);

9    *Shuster v. Symmetricon, Inc.*, No. 94-20024 RMW, 1997 WL 269490, at *8 (N.D. Cal. Feb. 25,

10   1997) (dismissing complaint because the allegedly false transaction ($600,000) "represented only

11   2% of [the company's] quarter revenue," which was immaterial as a matter of law).

12          Plaintiff alleges in conclusory fashion that Defendants failed to disclose that Polycom

13   reimbursed Mr. Miller for certain expenses "in material amounts" (¶ 16), but ignores that

14   Polycom has repeatedly found that the amounts in question were not material.  At the same time

15   that it announced Mr. Miller's resignation, as Plaintiff acknowledges, Polycom disclosed that its

16   Audit Committee had investigated and concluded that "[t]he amounts involved *did not have a*

17   *material impact on the Company's previously reported financial statements* for any period."

18   (¶ 100 (emphasis added).)  This determination was reaffirmed in Polycom's press release in

19   September 2013 (from which Plaintiff quotes without revealing the Company's conclusion) that

20   "the amounts involved did not have a material impact on the Company's previously reported

21   financial statements," (Ex. 4), and again in Polycom's proxy statement filed on April 25, 2014.

22          These disclosures establish that any alleged omissions regarding Mr. Miller's expense

23   reports are immaterial as a matter of law.  The Audit Committee's independent advisors

24   concluded that $77,000 of Mr. Miller's expenses were "most likely personal," and that $116,000

25   might (or might not) also be personal. (Ex. 5 at 59.)  Even if the entire $193,000 of these

26   reimbursements between 2011 and 2013 were personal expenses (which the Company has not

27   determined and which Mr. Miller denies), that number is a tiny fraction of Polycom's operating

28   expenses.  Polycom's total operating expenses for FY 2011 and 2012 totaled $1.5 *billion*.

1   (Decl. ¶ 35; Ex. 8 at 35.)  The entire $193,000 is one one-hundredth of one percent of Polycom's

2   operating expenses just for 2011 and 2012 (without taking into account operating expenses in the

3   first half of 2013, which would drive the percentage even lower).  *That infinitesimal fraction is*

4   *immaterial as a matter of law*.  (*See supra* at 8-9 & *infra* at 14 (collecting cases).)

5              In fact, Polycom has concluded not just that those amounts are immaterial, but that the

6   "*total amount of [Mr. Miller's] expenses in each period* were immaterial to Polycom's financial

7   statements."  (Ex. 5 at 60.)  A subset of an immaterial amount is, by definition, immaterial.[6]

8   Since there is no plausible basis to conclude that non-disclosures of *immaterial* amounts of

9   personal expenses would have "significantly altered the 'total mix' of information" available to a

10  reasonable investor, *TSC Indus.*, 426 U.S. at 449, Plaintiff's allegations fail.

11              a.      **No factual allegations contradict Polycom's conclusion**
                        **Mr. Miller's expenses were immaterial.**
12

13             Plaintiff offers various pieces of gossip and hearsay from seven unidentified "confidential

14  witnesses" about Mr. Miller's expense submissions, but pleads no facts supporting the conclusory

15  allegation that Polycom improperly reimbursed Mr. Miller for personal expenses "in material

16  amounts."  According to these witnesses, Mr. Miller was reimbursed for expensive dinners,

17  remodeling a corporate apartment, buying and renting luxury cars, and chartering jets.  (¶¶ 5, 48-

18  65.)  None of these witnesses, however, identifies the *amount* of personal expenses allegedly

19  reimbursed, explains how those reimbursements factored into the Company's reported operating

20  expenses, or claims that those reimbursements were *material* to Polycom's financial statements.

21  (*See* ¶¶ 48-65.)  They do not, in other words, support Plaintiff's allegation of a material omission,

22  or Plaintiff's theory that Defendants made other misstatements or omissions because those

23

24              [6] The Audit Committee's advisors determined that 60 "flight segments" between 2011 and
    2013 "were personal or were likely personal," but were unable to determine the amount of
25  expense associated with those flights.  (Ex. 5 at 60.)  Even if some or all of those flight segments
    were personal, and that they increased the total costs of flight segments that were otherwise
26  business-related, there is no basis to conclude that the related expenses were material.  To the
    contrary, the Company concluded that "Mr. Miller's total amount of expenses in each period were
27  immaterial to Polycom's financial statements."  (*Id.* (emphasis added).)  *In other words, even if*
    *all of Mr. Miller's expenses reimbursed by the Company had been personal, rather than business,*
28  *expenses, the impact on Polycom's financial statements still would not have been material.*

1    *immaterial* amounts were not disclosed.

2           Even if the confidential witnesses' statements supported Plaintiff's conclusory materiality

3    allegation—which they do not—the witnesses' statements cannot be considered because they fail

4    to meet the Reform Act's pleading requirements.  *See Zucco*, 552 F.3d at 995-96; *In re Daou Sys.,*

5    *Inc., Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).[7]  Factual allegations from confidential

6    witnesses must be detailed enough so that courts can discern "whether a confidential witness is

7    speaking from personal knowledge, or merely regurgitating gossip and innuendo."  *Limantour v.*

8    *Cray Inc.*, 432 F. Supp. 2d 1129, 1141 (W.D. Wash. 2006) (citation and quotation marks

9    omitted); *In re Commtouch Software Ltd. Sec. Litig.*, C 01-00719 WHA, 2002 WL 31417998, at

10   *3 (N.D. Cal. July 24, 2002) (dismissing complaint because it "frequently hedged on whether the

11   [confidential] witnesses were speaking from their own personal knowledge, or merely

12   regurgitating gossip and innuendo").  Statements by witnesses who are "not positioned to know

13   the information alleged," contain "unreliable hearsay," or set forth "conclusory assertions" are not

14   sufficiently reliable to meet the Reform Act's requirements.  *See Zucco*, 552 F.3d at 996.

15                    **b.      Statements by confidential witnesses who did not work at**
                              **Polycom during the class period are not based on personal**
16                            **knowledge.**

17          Confidential witnesses who did not work at the company during the alleged class period

18   lack personal knowledge, and their statements therefore fail to satisfy the Reform Act.

19   *See Zucco*, 552 F.3d at 996 (barring consideration of statements from confidential witnesses who

20   "were not employed by [the company] during the time period in question and have only

21   secondhand information about accounting practices . . . during that year").  Two of Plaintiff's

22   confidential witnesses did not work at Polycom during the class period.  (¶¶ 51-52.)  CW 4 "was

23   let go immediately after [Mr.] Miller took over as CEO" in June 2010—seven months before the

24   beginning of the class period.  (¶ 51.)  CW 5 departed even earlier, in May 2010.  (¶ 52.)  Because

25

26          _____
            [7] The heightened pleading requirements of the PSLRA apply to falsity and scienter (the
27   first and second elements of a Section 10(b) claim).  *In re Daou Sys., Inc.*, 411 F.3d at 1015
     (recognizing that "falsity and scienter in private securities fraud cases are generally strongly
28   inferred from the same set of facts," and thus "the two requirements may be combined into a
     unitary inquiry under the PSLRA") (citation omitted).

1    statements by these witnesses contain secondhand information devoid of personal knowledge

2    (*see* ¶¶ 54-56, 58-59, 61), they cannot be considered.  *See Zucco*, 552 F.3d at 996.

3                     **c.      Statements by confidential witnesses consisting of hearsay,
                            gossip, and innuendo are not reliable.**

4

5          Statements by confidential witnesses based on "vague hearsay," "gossip," or "innuendo"

6    likewise fail to satisfy the Reform Act's heightened pleading requirements.  *Zucco*, 552 F.3d at

7    997 ("A majority of the confidential witnesses base their knowledge on vague hearsay, which is

8    not enough to satisfy *Daou*'s reliability standard."); *Limantour*, 432 F. Supp. 2d at 1141 (holding

9    that "gossip and innuendo" do not satisfy the Reform Act).  The allegations from two witnesses

10   should be excluded on this basis:

11   •   CW 2 allegedly "*heard from people who are in a position to know* that Miller bought a
         Tesla automobile with company money."  (¶ 60 (emphasis added).)

12

13   •   CW 6 heard from another executive assistant that Mr. Miller's "rental car was sometimes
         returned days after [he] had left a particular city or area where the car was rented," and
         that the "*talk among executive assistants* was that [he] had a mistress who was using [his
         rental] car after [he] left a town he visited."  (¶ 62 (emphasis added).)

14

15   These statements contain vague hearsay, gossip, and innuendo, and therefore fail to satisfy the

16   Reform Act.  *See Zucco*, 552 F.3d at 997; *Limantour*, 432 F. Supp. 2d at 1141.

17                   **d.      Other statements by confidential witnesses are unreliable and
                            fail to support Plaintiff's claim.**

18

19         The remaining statements by confidential witnesses are unreliable and fail to plausibly

20   support Plaintiff's claim that Polycom reimbursed Mr. Miller for personal expenses in material

21   amounts.  For example, CW 3, a channel account manager at Polycom, "noted that [Mr.] Miller

22   *tried* to expense remodeling costs for his home."  (¶ 57 (emphasis added).)  Plaintiff does not

23   plead that this "channel account manager" had personal knowledge of Mr. Miller's expense

24   reports.  *See Zucco*, 552 F.3d at 995-96 (excluding statements not based on personal knowledge);

25   *In re Commtouch Software*, 2002 WL 31417998, at *3 (same).  In any event, CW 3 alleges only

26   that Mr. Miller "*tried*" to expense remodeling costs, not that Polycom actually paid for them.

27   Finally, there is no allegation that the remodeling costs were personal expenses of Mr. Miller's

28   instead of expenses related to a corporate apartment leased by Polycom.  (*See* ¶ 54

1   (acknowledging that Polycom leased an apartment for Mr. Miller as part of his compensation

2   package); Ex. 6 (Mr. Miller's offer letter showing that housing was part of his compensation

3   package); Ex. 7 (September 2010 Polycom letter extending living benefits for seven months).)

4          CW 6, a senior executive assistant in Polycom's Human Resources department, allegedly

5   stated that "[Mr.] Miller 'expensed literally everything.  It was over-the-top.'  [His] expenses

6   were 'off-the-charts.'  These included daily living expenses such as meals, dry cleaning,

7   transportation and entertainment."  (¶ 53.)  Again, Plaintiff does not plead how this executive

8   assistant—who never worked directly for Mr. Miller—had personal knowledge of Mr. Miller's

9   expense reports.  *See Zucco*, 552 F.3d at 995-96; *In re Commtouch Software*, 2002 WL 31417998

10  at *3.  Moreover, Plaintiff does not allege that meals, dry cleaning, transportation, and

11  entertainment do not qualify as "business expenses" for a CEO who, according to the Complaint,

12  was "on the road, out of 90, 95% of the time meeting with customers and partners."  (¶ 33.)

13         Finally, the Complaint includes allegations from Mr. Miller's ex-wife, CW 7.  (¶¶ 63-65.)

14  CW 7 describes a dinner attended by CW 7, her friends, Mr. Miller, and another Polycom

15  employee.  (¶ 64.)  CW 7 also describes a Company event in Argentina, where Mr. Miller

16  "chartered a jet—at the Company's expense—to take him, CW 7, and several other Polycom

17  executives to see Iguazu Falls."  (¶ 65.)  Importantly, both of these events were attended by other

18  Polycom personnel.  Given that CW 7 never worked at Polycom, her statements about the

19  *business* purpose of these events (all of which were attended by other Polycom employees) are

20  not sufficiently reliable.  *See Zucco*, 552 F.3d at 995-96.[8]

21                          **e.      The failure to allege facts demonstrating that Mr. Miller's
22                                  allegedly false expense reports constituted a material omission
                                    is fatal to Plaintiff's case.**

23         For the reasons stated above, Plaintiff fails to provide any facts supporting his allegation

24  that Polycom improperly reimbursed Mr. Miller "in material amounts."  The statements by the

25  confidential witnesses cannot be considered under the Reform Act's heightened pleading

26  _____

27         [8] There is also no reason to believe that statements from Mr. Miller's *ex-wife* are
    sufficiently unbiased to be "reliable."  *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757
    (7th Cir. 2007) (discounting allegations from confidential witnesses because it was unclear
28  whether they had "axes to grind").

1    standards because they are not based on personal knowledge and are not reliable.  Plaintiff's

2    failure to plead that Mr. Miller's allegedly false expense reports constituted a material omission is

3    fatal to his case.  Without allegedly improper reimbursements in material amounts, there is no

4    basis to conclude that Polycom's operating expenses were *materially* misstated, that the

5    effectiveness of Polycom's internal controls were misstated for failing to prevent *immaterial*

6    reimbursements, or that *immaterial* reimbursements created a risk of Mr. Miller's termination.

7         For these reasons, and those below, Plaintiff fails to allege that Mr. Miller made any false

8    statements or omissions of material fact.

9    **2.    Polycom's Alleged Misstatements About Its Operating Expenses Are
         Not Actionable Because There Are No Factual Allegations that
10        Mr. Miller Was Reimbursed for Personal Expenses in Material
         Amounts.**

11

12        Plaintiff cannot establish that Polycom materially misstated its operating expenses without

13   alleging facts that, if proven, would establish that Mr. Miller was reimbursed for his personal

14   expenses in material amounts.  (*See, e.g.*, ¶¶ 6, 73.)  For the reasons discussed above, no factual

15   allegations support Plaintiff's claim that Polycom reimbursed Mr. Miller's personal expenses in

16   material amounts.  Improper expenses amounting to one one-hundredth of one percent of

17   Polycom's operating expenses are immaterial as a matter of law.  (*See supra* at 8-9.)  There is

18   thus no factual support for Plaintiff's conclusory allegation that Polycom materially misstated its

19   operating expenses.  *See Parnes*, 122 F.3d at 547 (alleged overstatement of assets by 2%

20   immaterial); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 895 (alleged misstatement of

21   earnings by 2% immaterial); *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *8

22   (alleged undisclosed expenses of 1% of total sales and 10% of before-tax income immaterial); *In

23   re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 994 (D. Ariz. 1999) (stating that "revenue

24   shortfalls of 10% or less may be immaterial as a matter of law").

25   **3.    Alleged Misstatements About Polycom's Internal Controls Are Not
         Actionable Under Federal Securities Laws.**

26

27        Claims based on misrepresentations about a company's internal controls sound in

28   corporate mismanagement, not fraud, and are not actionable under federal securities laws.

1  *See Andropolis*, 505 F. Supp. 2d at 682 (holding that claims for a company's "deficient disclosure

2  and financial reporting controls" do not state a claim under federal securities laws); *In re The*

3  *First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 161 (D. Mass. 2009) (holding that

4  "generalized claims of mismanagement" are not actionable).

5        In *Andropolis*, for example, the plaintiff alleged that the defendant company's expense

6  "reimbursement system was a joke," and that company executives "would charge virtually

7  everything, including personal expenses, to [the company's] American Express card."  505 F.

8  Supp. 2d at 668.  On this basis, the plaintiff claimed that defendants made misstatements or

9  omissions in the company's Forms 10-Q and press releases by misrepresenting the effectiveness

10  of the company's internal controls.  *Id.* at 683.  The court dismissed the claim because the

11  plaintiff did not allege that the company actually failed to evaluate its internal controls or find

12  them effective.  *Id.* at 683.  The plaintiff's implication that the company *should* have found its

13  controls ineffective given the widespread abuse did not change the court's analysis.  The court

14  held that the "'central thrust' of  Plaintiff's allegations concerning [the company's] corporate

15  deficiencies allege[s] no more than corporate mismanagement," which "do[es] not support a

16  federal cause of action."  *Id.* at 683.

17        As in *Andropolis*, there are no allegations here that Defendants failed to evaluate

18  Polycom's internal controls or found them ineffective.  And, even if there were such allegations,

19  they would amount to claims for "corporate mismanagement"—which are not actionable.  *See id.*

20          **4.**      **Defendants' Alleged Misstatements About Polycom's Code of Business**
21                **Ethics and Conduct Fail Because Defendants Did Not Make False**
                     **Statements, and Ethics Code Violations Are "Aspirational."**

22        Securities fraud claims predicated on ethics code violations have "been soundly rejected

23  by those courts that have considered [them]."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines,*

24  *Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009).  The reason for this unanimous rejection is that

25  ethics codes are "inherently aspirational."  *Andropolis*, 505 F. Supp. 2d at 686.  They set helpful

26  guidelines for corporate behavior, but incorporating them by reference in SEC filings does not

27  itself imply an absence of violations.  *See id.*; *SEC v. Kovzan*, 807 F. Supp. 2d 1024, 1042

28  (D. Kan. 2011) (rejecting alleged violation of company's ethics code because proxy's

1   incorporation by reference does not imply absence of violations).  To hold otherwise would lead

2   to absurd results because it would effectively "render every code of ethics materially misleading

3   whenever an executive commits an ethical violation following a scandal." *Cement & Concrete*

4   *Workers*, 964 F. Supp. 2d at 1140.  "[I]t simply cannot be that every time a violation of [a

5   company's ethics] code occurs, a company is liable under federal law for having chosen to adopt

6   the code at all, particularly when the adoption of such a code is effectively mandatory."

7   *Andropolis*, 505 F. Supp. 2d at 686.

8          Plaintiff also claims that Mr. Miller made a material misrepresentation in his offer letter

9   dated June 5, 2009, which stated that his offer was contingent on his "understanding of, and

10  commitment to, the standards and policies contained in Polycom's Code."  (¶ 46.)  Plaintiff does

11  not allege, however, that Mr. Miller's "understanding of" and "commitment to" Polycom's Ethics

12  Code in 2009 was materially false or misleading when he signed the letter.  *See In re Foundry*

13  *Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 22077729, at *5 (N.D. Cal.

14  Aug. 29, 2003) (dismissing claim when there was no evidence that defendants' statements were

15  false or misleading when they were made).  Moreover, this statement is not actionable because it

16  is wholly aspirational.  *See Andropolis*, 505 F. Supp. 2d at 686; *Cement & Concrete Workers*,

17  964 F. Supp. 2d at 1138.  For these reasons, Plaintiff cannot establish any material misstatements

18  based on alleged violations of Polycom's Ethics Code.

19              **5.     Defendants' Alleged Misstatements about the Risks of Mr. Miller's**
                         **Resignation Are Not Actionable Because They Were Not False.**
20

21         Plaintiff alleges that Mr. Miller misstated a material fact when he said that he was

22  "planning on being here [at Polycom] for quite a period of time," and that Defendants made

23  omissions of material fact in connection with their risk disclosure statements about executive

24  retention by failing to disclose a "significant risk" that Mr. Miller would leave the Company.

25  (*See, e.g.*, ¶¶ 10, 73, 92.)  Neither of these statements is actionable.

26         First, Plaintiff does not allege that Mr. Miller's statement about planning to be at Polycom

27  was false when it was made.  *See In re Foundry Networks*, 2003 WL 22077729, at *5.  Moreover,

28  Mr. Miller merely expressed his hope that he would remain at Polycom—he did not state that he

would, in fact, stay.  *See Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 230 (S.D.N.Y. 2009) (holding that expressions of "hope" that events would happen were immaterial as a matter of law); *Cement & Concrete Workers*, 964 F. Supp. 2d at 1141 (dismissing claim because there was no affirmative representation that company's CEO would stay).

Second, Polycom disclosed the risk that changes in its executive management team could cause disruption to its business:

> Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods . . . .

(*E.g.*, ¶ 71.)  These risk disclosures were not false, and they did not create a duty to disclose any irregularities in Mr. Miller's expense reports.  *See Cement & Concrete Workers*, 964 F. Supp. 2d at 1141 (stating that "the risk factor statements [about executive retention] were not false, nor did they create a duty to disclose [defendant CEO's] alleged violations of the code of ethics"); *In re FoxHollow Techs., Inc., Sec. Litig.*, C 06-4595 PJH, 2008 WL 2220600, at *19 (N.D. Cal. May 27, 2008) (forward-looking statements about executive retention were not actionable), *aff'd*, 359 F. App'x 802 (9th Cir. 2009).

Because Plaintiff has failed to allege specific facts establishing a material misstatement or omission, Plaintiff's section 10(b) claim should be dismissed.

## C.     Plaintiff Fails to Plead Loss Causation Because Disappointing Financial Results, Not a Corrective Disclosure that Revealed the "Truth" About a Past "Fraud," Caused the Alleged Losses.

The Reform Act, 15 U.S.C. § 78u-4(b)(4), requires a plaintiff to plead loss causation— "the 'causal connection between [defendants'] material misrepresentation and [plaintiff's] loss.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (quoting *Dura*, 544 U.S. at 342).  "To plead loss causation, a plaintiff must allege (1) the fraudulent statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known."  *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) (granting motion to dismiss) (citing *Dura*, 544 U.S. at 346-47).  Allegations that the market learned of and reacted to a

company's "poor financial health" rather than any alleged fraud are insufficient to plead loss causation. *Metzler*, 540 F.3d at 1063; *see also Dura*, 544 U.S. at 342-43 (loss must be caused because truth of the prior fraudulent activity "ma[de] its way into the marketplace," not because of "changed conditions, or other events" independent of the alleged fraud). Plaintiff's allegations in this case are insufficient to plead loss causation.

> ### 1.    Plaintiff Has Not Pled that the Disclosure of Allegedly Fraudulent Practices Was Revealed to the Market and "Caused" Resulting Losses.

Plaintiff fails adequately to allege that the revelation of a past fraud to the market caused Polycom's stock price to fall. *See Metzler*, 540 F.3d at 1063 (requiring same).

In the disclosure that Plaintiff claims revealed the Defendants' fraud and caused Polycom's stock price to drop, the Company announced that its revenues, net income, and gross profits had all declined year-over-year. (Exs. 1, 2.) Polycom's CFO, Defendant Brown, also gave revenue guidance for the following quarter *below* these decreased levels, and announced that the Company was expecting "a reduced U.S. Federal and public sector spending environment in Q3," and was "experiencing delays in procurement cycles, as the effect of sequestration impact of the U.S. Federal portion of our business." (Ex. 9 at 2.) Analysts noted that the Company's forward outlook had decreased for five of the past six quarters and that its guidance for Q3 2013 was "well below the consensus estimate." (Exs. 11, 12.)

Plaintiff makes no attempt to isolate that portion of the $1.68 stock drop allegedly caused by the revelation of "fraud" from this "tangle of [other] factors" affecting the share price. *Dura*, 544 U.S. at 343 (explaining that "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" may account for some or all of a lower trading price). *This failure alone warrants dismissal. See, e.g.*, *Metzler*, 540 F.3d at 1065 (dismissing complaint where the allegedly corrective disclosure itself "contained a far more plausible reason for the resulting drop in [the company's] stock price—the company failed to hit prior earnings estimates"); *see also In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008) (dismissing complaint that did "not account for the fact that the [corrective disclosure] contained other 'bad news'"); *cf. In re*

1    *Redback Networks, Inc. Sec. Litig.*, No. C 03-5642 JF (HRL), 2007 WL 963958, at *6 (N.D. Cal.

2    Mar. 30, 2007) (dismissing complaint for failure to plead loss causation, and directing that any

3    amended complaint should "clearly allege what portion of the stock drop [plaintiffs] believe was

4    caused by the alleged fraud").

5         Notably, Plaintiff himself alleges elsewhere only that analysts "reacted negatively to

6    Miller's departure." (¶ 103.) But reacting negatively to news of Mr. Miller's departure is not the

7    same as reacting negatively to news of fraud. (*Infra* at 22-24.) Not only did analysts not question

8    the veracity of Defendants' past statements (*id.*), but they explained that it was the Company's

9    disappointing financial results, lowered revenue guidance, and bleak economic prospects—in

10   addition to Mr. Miller's resignation *qua* resignation, but not the revelation of fraud—that led to

11   their negative assessment of Polycom's stock:

12   - "We are downgrading Polycom to Underweight as we believe fundamentals for hardware
          suppliers in the video conferencing industry will continue to deteriorate." (Ex. 11 at 1.)

13
     - "We would not be surprised if Polycom (and the video industry) experienced declining
14        sales for the next few years . . . ." (*Id.*)

15   - Revenues were "down"; "Non-GAAP gross margin reached 3 year lows"; management's
          revenue guidance for Q3 2013 was "well below the consensus estimate"; and "structural
16        issues clearly remain, as the company is struggling between the transition from a hardware
          to software based industry." (*Id.*)

17
     - Management's Q3 2013 guidance was "below . . . consensus." (Ex. 10 at 1.)
18
     - There was a year-over-year decline in revenues, and guidance was "lower than
19        expectations" and "below our original and the consensus estimate." (Ex. 13 at 1.)

20   - "For the past five out of six quarters, Polycom has reduced its forward outlook." (Ex. 12
          at 1.)
21
     - "We downgrade Polycom shares to Underperform due to the sudden termination of its
22        CEO, *lowered near-term outlook, and ongoing execution inconsistencies*." (*Id.* (emphasis
          added).)
23

24   Plaintiff does not address, or even acknowledge, the impact that Polycom's financial results,

25   lowered revenue guidance below analysts' expectations, and negative outlook (all of which were

26   discussed in the analysts' reports Plaintiff cites) had on Polycom's stock price.

27        The market's reaction to Polycom's announcement of Q2 2013 earnings was consistent

28   with its reaction to Polycom's disclosures throughout the class period, including those that

Plaintiff alleges "artificially inflated" the stock price.  Plaintiff points to 10 SEC filings and 10 press releases that allegedly contained false and misleading statements and omissions and "had the cause and effect of creating in the market an unrealistically positive assessment of Polycom, thus causing the Company's shares to be overvalued and artificially inflated."  (¶ 118; *see also* ¶¶ 69-99 (setting forth the allegedly false and misleading statements).)

*In all but two instances, however, the Company's share price **dropped** the day after the alleged misstatements and omissions were made in the Company's SEC filings.*[9]  *The Company's share price also **fell** the day after fully half the press releases that Plaintiff alleges contained misstatements and omissions were issued.*[10]  Notably, the day after the press release announcing Q3 2011 financial results on October 19, 2011, Polycom's share price dropped $5.50, *or 25%*; this single-day decline of 25% was greater than any other movement in the Company's share price after an announcement during the class period and greater than the drop experienced the day after the "truth" was allegedly revealed.  Moreover, when the share price fell $1.08 (or 11.9%) the day after the Company issued a press release announcing financial results for Q2 2012 on July 24, 2012, the stock price dropped to $8.03, the lowest during the class period and more than 15% *below* the $9.50 to which the share price declined the day after Mr. Miller's resignation was

---

[9] (*See* Decl. ¶¶ 18-25; Ex. 14 (share price fell $0.75 (or 3.2%) the day after Polycom filed its Form 10-K on February 18, 2011; share price fell $0.18 (or 0.6%) the day after Polycom filed its Form 10-Q on April 28, 2011; share price fell $0.54 (or 3.3%) the day after Polycom filed its Form 10-Q on October 31, 2011; share price fell $0.25 (or 1.1%) the day after Polycom filed its Form 10-K on February 17, 2012; share price fell $0.14 (or 1.1%) the day after Polycom filed its Form 10-Q on May 1, 2012; share price fell $0.23 (or 2.6%) the day after Polycom filed its Form 10-K on August 1, 2012; share price fell $0.17 (or 1.7%) the day after Polycom filed its Form 10-K on February 14, 2013; share price fell $0.27 (or 2.6%) the day after Polycom filed its Form 10-Q on April 30, 2013).)  On the two instances when Polycom's share price rose after a filing—$0.72 (or 2.8%) after the Company filed its Form 10-Q on August 2, 2011, and $0.47 (or 4.7%) after the Company filed its Form 10-Q on October 31, 2012—the price fell to pre-filing levels immediately thereafter, dropping $1.96 (or 7.4%) the following day on the former occasion, and below the pre-filing share price within a week of the latter.  (Decl. ¶¶ 26-27; Ex. 14.)

[10] (*See* Decl. ¶¶ 17, 28-31; Ex. 14 (share price fell $5.50 (or 25.2%) the day after the Company issued a press release announcing Q3 2011 financial results on October 19, 2011; share price fell $0.47 (or 3.5%) the day after the Company issued a press release announcing Q1 2012 financial results on April 18, 2012; share price fell $1.08 (or 11.9%) the day after the Company issued a press release announcing financial results for Q2 2012 on July 24, 2012; share price fell $0.62 (or 5.3%) the day after the Company issued a press release announcing financial results for Q4 2012 on January 23, 2013; share price fell $0.64 (or 6%) the day after the Company issued a press release announcing financial results for Q1 2013 on April 23, 2013).)

announced.[11]  (*See* Decl. ¶ 17; Ex. 14.)  Plaintiff cannot plead loss causation if the share price was not "artificially inflated" in the first place.  *See Dura*, 544 U.S. at 346-47 (alleging that stock price was "artificially inflated" not enough to plead loss causation); *see also Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (granting motion to dismiss and noting that, "in a fraud-on-the-market case, the plaintiff must prove . . . that a fraudulent misrepresentation artificially inflated the security's value . . . .").

The only plausible inference from Plaintiff's allegations (and the documents incorporated in the Complaint by reference and subject to judicial notice) is that the market reacted negatively to Polycom's announcement of disappointing financial results and prospects, just as it had throughout the class period following Polycom's earnings releases and SEC filings.  (*See supra* at 19-21 & notes 9, 10.)  *See also In re Nvidia Corp. Sec. Litig.*, No. 08-CV-04260-RS, 2010 U.S. Dist. LEXIS 114230, at *45 (N.D. Cal. Oct. 19, 2010) (granting motion to dismiss complaint that "fail[ed] to address the far more plausible reason for the resulting drop in [the company's] stock price"—the disclosure of disappointing earnings); *Merrill Lynch*, 568 F. Supp. 2d at 365 ("[Plaintiff's] attempt to plead loss causation fails because he has not alleged facts that all, or even some, of his losses are due to the alleged fraud, rather than to intervening events and/or to the disclosure of other information").

In addition, the fact that the Company's share price declined throughout most of the class period further undermines the adequacy of Plaintiff's loss causation pleading.  (Ex. 14.)  Polycom's stock traded at $19.09 per share on the first day of the class period, and it rose to a high of $33.53 per share less than six months later, following a 2-for-1 stock split.  From July 6, 2011, to July 25, 2012, the day after the Company announced its Q2 2012 financial results, the stock fell 76%—$25.50 per share—to a low of $8.03.  (Decl. ¶ 33.)  From July 25, 2012, until the end of the class period on July 23, 2013, shares traded between $8.03 and

---

[11] Plaintiff also alleges that Mr. Miller's statement on February 13, 2013, that "right now" he planned to be at the Company for "quite a period of time" was a material misstatement.  (¶ 92.) Not only is it impossible for this statement to have caused Polycom's stock price to be artificially inflated for the more than two years of the class period before it was made, but Polycom's stock price *fell* the day after this statement was issued, as well.  (*See* Decl. ¶ 32; Ex. 14.)

$12.01, usually in the $9-11 range; sometimes the price was above the $9.50 at which the stock

traded on July 24, 2013, and often it was below.  (*See* Ex. 14.)  Loss causation cannot adequately

be pled where a company's share price has substantially declined in value throughout the class

period at a time when defendants were allegedly issuing false and misleading statements that

artificially inflated the stock's value.

> The conclusion from all these circumstances is that the events of [July 23, 2013], which are said in the complaint to have brought about the economic loss, *did not do so*.  The loss in value of the stock occurred gradually over the course of the entire class period, and the stock had lost most of its value before the [July 23, 2013] events.  This gradual loss of value occurred during the time when the alleged false and misleading comments . . . were being issued.  The complaint does not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation.

*60223 Trust v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (granting

motion to dismiss) (emphasis in original); *see also Merrill Lynch*, 568 F. Supp. 2d at 364-65

(stock declined significantly in value before a single allegedly corrective disclosure was issued).[12]

Finally, the decline in Polycom's stock price on which Plaintiff's claim is based was

short-lived.  Polycom's stock gained back 50% of its lost value in less than a month, and 85% in

less than two months.  (Decl. ¶ 16; Ex. 14.)  This further undermines Plaintiff's conclusory loss

causation allegations.  *See Metzler*, 540 F.3d at 1064 (affirming dismissal for failure to plead loss

causation and noting that the "stock recovered very shortly after the modest 10% drop that

accompanied the [alleged corrective disclosure]").

## 2. The July 23, 2013 Press Release and Earnings Call Did Not Reveal the Material Falsity of Any Prior Statement.

Plaintiff also fails to plead loss causation because he did not identify any corrective

disclosure in which "the practices that the plaintiff contends are fraudulent were revealed to the

market and caused the resulting losses."  *Metzler*, 540 F.3d at 1063; *see also Scandlon v. Blue

Coat Sys.*, No. C 11-4293 RS, 2013 WL 5313168, at *4 (N.D. Cal. Sept. 23, 2013) (granting

---

[12] As noted, the stock lost 76% of its value between July 6, 2011, and July 25, 2012. (Decl. ¶ 33.)  Even looking only at the share price on the first day of the class period, $19.09, and that on the last day of the class period, $11.18, the stock declined 41% before the single allegedly corrective disclosure reached the market.  (Decl. ¶ 34.)

motion to dismiss; plaintiff did not identify any "corrective disclosure" and had to "make some showing that the drop in stock price reflects investors becoming aware prior representations were false or misleading").

The single "corrective disclosure" on which Plaintiff relies did not reveal to the market that any of Polycom's class-period disclosures contained any material misrepresentation or omission.  To the contrary:  on July 23, 2013, Polycom informed investors that Mr. Miller had resigned and that the Audit Committee found "certain inconsistencies" in "certain of Mr. Miller's expense submissions" for amounts that "*did not have a material impact* on the Company's previously reported financial statements."  (¶ 100 (emphasis added); *see also* ¶ 101; Exs. 2, 9.)

Nothing in this disclosure told investors that any prior representations to the market in the Company's Forms 10-Q, Forms 10-K, press releases, or elsewhere were materially false or misleading.  Notably, no one (other than plaintiffs' lawyers), including the analysts who Plaintiff alleges "reacted negatively" to the news, suggested that the July 23, 2013 announcement revealed that the Company's past disclosures contained material misrepresentations or omissions, or otherwise questioned, in any way, the truth of the class-period disclosures that Plaintiff alleges were materially false and misleading.  *Cf. In re Daou Sys.*, 411 F.3d at 1026 (holding loss causation sufficiently pled where analyst reports specifically noted "*[y]ou have got to question whether they are manufacturing earnings*") (emphasis in original).

Plaintiff's allegations, like those, for example, in *HomeBanc*, "never explain how . . . any of the claimed adverse information that was revealed, which is described in the complaint as the 'truth,' actually revealed the falsity of any alleged prior statement or omission, subsequently causing a drop in stock price.  Indeed, notwithstanding Plaintiff's conclusory heading . . . that the truth finally begins to emerge with [Polycom's July 23, 2013 press release], the [press release] did not state that [Polycom's] earlier statements issued during the class period were materially inaccurate, would need to be restated, or were in any way tainted by misconduct."  *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1361 (N.D. Ga. 2010).  Plaintiff's failure to plead an adequate link between the challenged statement and the disclosure that allegedly caused a loss requires dismissal.  *See id.* (dismissing complaint for failure to plead loss causation); *see*

1    *also Metzler*, 540 F.3d at 1063, 1072 (affirming dismissal where the alleged corrective

2    disclosures did not reveal the widespread fraud alleged in the complaint to the market); *In re*

3    *Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (granting motion

4    to dismiss where the alleged corrective disclosures did not reveal the alleged fraud to the market);

5    *Glenbrook Capital Ltd. P'ship v. Kuo*, 525 F. Supp. 2d 1130, 1142 (N.D. Cal. 2007) (granting

6    motion to dismiss where plaintiff failed to plead facts "establishing the necessary direct link

7    between particular omissions by Defendants and the decrease in the stock price"); *Weiss v. Amkor*

8    *Tech., Inc.*, 527 F. Supp. 2d 938, 946-48 (D. Ariz. 2007) (dismissing complaint that failed to

9    establish the "critical link" between the alleged misrepresentations/omissions and a stock drop

10   after the truth about such misrepresentations/omissions was revealed, and collecting cases).

11           For the reasons set forth above, Plaintiff's Complaint should be dismissed for failure

12   adequately to allege loss causation.

13           **D.      Plaintiff Fails to Plead Particularized Facts Giving Rise to a "Strong
                        Inference" that Mr. Miller Intended to Mislead Investors.**
14

15           Plaintiff has not pled with particularity facts giving rise to a "strong inference" that

16   Mr. Miller acted intentionally or with deliberate recklessness to mislead investors. *Tellabs, Inc. v.*

17   *Makor Issues & Rights Ltd.*, 551 U.S. 308, 313-14, 324 (2007) (strong inference of scienter must

18   be both "cogent" and "at least as compelling as any opposing inference one could draw from the

19   facts alleged"); *Zucco*, 552 F.3d at 991; 15 U.S.C. § 78u-4(b)(2).[13]  The question here is not

20   whether Plaintiff has pled scienter with respect to Mr. Miller's submission of his expense reports.

21   The real issue is whether Plaintiff has pled particularized facts giving rise to the strong inference

22   that, in making statements in press releases and SEC filings concerning Polycom's financial

23   results and business operations, Mr. Miller "either intended to mislead investors or knew (or

24   should have known) that failing to disclose his [alleged mis-]conduct would artificially inflate

25   [Polycom's] stock." *Cement & Concrete Workers*, 964 F. Supp. 2d at 1143 (granting motion to

26   dismiss complaint based on nearly identical allegations against Hewlett Packard's former CEO).

27   _____

28   [13] Deliberate recklessness is "not merely simple, or even inexcusable negligence," but
     rather "a form of intentional or knowing misconduct." *Zucco*, 552 F.3d at 991.

The Complaint fails to satisfy the Reform Act's "[e]xacting pleading requirements." *Tellabs*, 551 U.S. at 313.  Plaintiff has pled, at most, that Mr. Miller knew that certain of his expense reports were inaccurate.  This is not sufficient, however, "to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001).[14]

Because Plaintiff fails to allege specific facts that lead to a strong inference of intentional deception of *investors*—rather than an internal dispute over non-material amounts of expenses allegedly approved by Defendant CFOs—Plaintiff's section 10(b) claim should be dismissed.

## II.   PLAINTIFF FAILS TO PLEAD A SECTION 20(A) CLAIM.

Section 20(a) allows recovery against persons who exercise control over entities that violate section 10(b).  *Zucco*, 552 F.3d at 990; 15 U.S.C. § 78t(a).  Because Plaintiff has failed to allege a violation of section 10(b), his control person claim under section 20(a) should also be dismissed.  *See Zucco*, 552 F.3d at 990; *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).

### CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint with prejudice.

Dated:  April 25, 2014

PAUL T. FRIEDMAN
PHILIP T. BESIROF
MORRISON & FOERSTER LLP

By:  ___*/s/ Paul T. Friedman*___
        PAUL T. FRIEDMAN

Attorneys for Defendant
ANDREW M. MILLER

---

[14] Plaintiff's allegations that Mr. Miller had a motive to commit fraud based on his "handsome compensation package," the majority of which was comprised of stock awards (¶¶ 108-09), are insufficient.  Courts routinely reject these types of allegations as insufficient to plead scienter, *see, e.g.*, *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012); *Zucco*, 552 F.3d at 1004-05, particularly where, as here, Mr. Miller is not alleged to have traded on insider information, *see, e.g.*, *Rigel*, 697 F.3d at 884-85; *Andropolis*, 505 F. Supp. 2d at 678 ("[T]he inference of scienter in this case is particularly weak given that Plaintiff does not allege inside stock sales intended to take advantage of [the company's] purportedly intentional inflation of earnings.") (collecting cases).

1

**ECF ATTESTATION**

2

3          I, Philip Besirof, am the ECF User whose ID and Password are being used to file

4    this motion.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Paul Friedman has

     concurred in this filing.

5

6    Dated:  April 25, 2014          PAUL T. FRIEDMAN
                                     PHILIP T. BESIROF
7                                    MORRISON & FOERSTER LLP

8                                    By:   */s/ Philip T. Besirof*
                                          PHILIP T. BESIROF
9

10                                   Attorneys for Defendant
                                     ANDREW M. MILLER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   sf-3406969