**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK NATHANSON, individually and on behalf of all others similarly situated, | Case No. 13-3476 SC |
|  | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS |
| Plaintiff, |  |
| v. |  |
| POLYCOM, INC., ANDREW M. MILLER, MICHAEL R. KOUREY, and ERIC F. BROWN, |  |
| Defendants. |  |

## I.   <u>INTRODUCTION</u>

Now before the Court are two motions to dismiss Plaintiff's first amended complaint ("FAC" or "Complaint"), ECF No. 47, in this securities fraud case. The first motion to dismiss was filed by Defendants Polycom, Inc. and Polycom's last two Chief Financial Officers ("CFOs"), Michael Kourey and Eric Brown. ECF No. 51 ("Polycom Mot."). Collectively the Court will refer to these Defendants as "the Polycom Defendants." The second motion to dismiss was filed by Defendant Andrew Miller, Polycom's former CEO. ECF No. 53 ("Miller Mot.").

///

**United States District Court**
For the Northern District of California

These motions are fully briefed[1] and appropriate for resolution without oral argument under Civil Local Rule 7-1(b).  As explained below, the motions are GRANTED IN PART and DENIED IN PART.

## II.   <u>BACKGROUND</u>

This is a putative class action alleging securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 against Polycom, Inc., a San Jose-based provider of video and telecommunication systems, two former Polycom CFOs and Polycom's former CEO, Andrew Miller.

During Miller's tenure as CEO, he allegedly claimed reimbursements for numerous extravagant personal expenses with no legitimate business purpose.  Seeking reimbursement for these expenses was prohibited by Polycom's Code of Business Ethics and Conduct, which bars the use of Polycom funds for individual purposes and requires individuals seeking reimbursements file detailed expense reports.  While Polycom's general reimbursement process is irrelevant here, Polycom required its CFO to sign off on expense reports

Eventually these improper expenses caught up with Miller, and after an investigation by Polycom's Audit Committee uncovered irregularities with his expense reports, Miller resigned.  After Miller's departure was announced, Polycom's stock dropped significantly, losing over fifteen percent of its value.  Also after his departure was announced, the SEC began an investigation

---

[1] Plaintiff filed a consolidated opposition, ECF No. 58 ("Opp'n"), and Defendants filed replies, ECF Nos. 59 ("Polycom Reply"), 60 ("Miller Reply").

United States District Court
For the Northern District of California

into Miller's expenses and his resignation.  Since these matters were fully briefed, the SEC entered into a cease-and-desist order with Polycom, finding that Polycom violated Sections 13(a) and 14(a) of the Exchange Act and related SEC rules, and failed to adequately disclose executive compensation under Item 402 of Regulation S-K.  ECF No. 71-2 ("Cease-and-Desist").[2]  The SEC also recently filed an enforcement action against Miller alleging violations of, among other things, Section 10(b) of the Exchange Act and Rule 10b-5.  ECF No. 71-1 ("SEC Compl.").[3]

In January, the Court granted a motion to dismiss a related derivative case alleging breaches of fiduciary duty, concluding that plaintiffs there had failed to adequately plead demand futility.  See In re Polycom, Inc. Derivative Litig., -- F. Supp. 3d --, 2015 WL 164198 (N.D. Cal. Jan. 13, 2015).  In this case, Plaintiff takes a different tack, alleging that Polycom, the CFOs, and Miller made various false or misleading statements or omissions regarding, among other things, Miller's future at the company, his expense reimbursements, Miller's compliance with Polycom's expense reimbursement policy, and the reliability of Polycom's internal controls.

Both Miller and the Polycom Defendants have moved to dismiss these allegations, arguing that Plaintiff has failed to adequately

[2] Plaintiff's counsel submitted a letter on April 3, 2015 attaching this and other filings and requesting the Court take judicial notice.  Because these documents are "not subject to reasonable dispute," and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Federal Rule of Evidence 201(b), the request is GRANTED and the Court takes judicial notice of these documents.

[3] The Court notes that the SEC matter, SEC v. Miller, 3:15-cv-1461-HSG, is likely related to this case.  See Civ. L.R. 3-12(a)(1).

**United States District Court**
For the Northern District of California

plead various elements of a securities fraud cause of action. Plaintiff opposes.

### III. **LEGAL STANDARDS**

#### A. **Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The allegations made in a complaint must be both "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it" and "sufficiently plausible" such that "it is not unfair to require the opposing party to be subjected to the expense of discovery." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

///

///

4

**United States District Court**
For the Northern District of California

**B.   Exchange Act and Rule 10b-5**

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ."  15 U.S.C. § 78j(b).  One such rule prescribed by the SEC is Rule 10b-5.  Rule 10b-5 makes it unlawful to (a) employ any device, scheme, or artifice to defraud; (b) make an untrue statement of material fact or omit a material fact necessary to make a statement not misleading; or (c) engage in an act, practice, or course of business which operates as a fraud or deceit in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.

To establish a violation of Section 10(b) or Rule 10b-5, Plaintiff must plead five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  In re Daou Sys., 411 F.3d 1006, 1014 (9th Cir. 2005).

To survive a motion to dismiss on such claims, Plaintiff must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the

**United States District Court**
For the Northern District of California

defendant acted with the required state of mind." Id. § 78u-4(b)(2).  To satisfy the state of mind element, the complaint must allege the defendant acted intentionally or with deliberate recklessness.  See Daou, 411 F.3d at 1014-15.  "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA."  Id. at 1015 (internal quotation marks omitted).

**IV.  DISCUSSION**

Plaintiff's allegations are essentially two-fold.  First, Plaintiff argues that, as a result of Miller's improperly claimed personal expenses, Polycom's publicly reported operating expenses were materially false or misleading.  FAC ¶ 6.  Second, Plaintiff asserts that because Miller and Polycom failed to disclose that Miller was misappropriating Polycom funds and thus might be terminated at any time, Miller and Polycom made materially false or misleading statements in various SEC filings or, in one case, on an earnings phone call.

The Polycom Defendants and Miller move to dismiss the Complaint on the grounds that Plaintiff has inadequately pleaded various elements of his cause of action.  Specifically, the Polycom Defendants and Miller argue first that even if classifying Miller's expenses as operating expenses was misleading, the amounts involved were too miniscule to be material.  Second, Defendants argue that the allegedly false or misleading statements not material, false or

**United States District Court**
For the Northern District of California

1  misleading, or are otherwise not actionable.  Third, the Polycom

2  Defendants argue that Plaintiff has inadequately pleaded the

3  requisite "strong inference" of scienter required by the PSLRA.

4  Finally, because (in the Polycom Defendants and Miller's view) the

5  Complaint fails to plead a predicate violation of Rule 10b-5,

6  Plaintiff also fails to plead a Section 20(a) claim.

7      The Court discusses the materiality of the allegedly false

8  statements or omissions about Miller's expenses and Polycom's

9  revenues first before addressing individually each of the allegedly

10 false or misleading statements.

11     **A.   <u>Materiality</u>**

12     A statement must be both material and misleading to be

13 actionable under the PSLRA.  <u>Cement & Concrete Worker District</u>

14 <u>Council Pension Fund v. Hewlett Packard Co.</u>, 964 F. Supp. 2d 1128,

15 1138 (N.D. Cal. 2013).  A statement is misleading "if it would give

16 a reasonable investor the 'impression of a state of affairs that

17 differs in a material way from the one that actually exists.'"

18 <u>Berson v. Applied Signal Tech., Inc.</u>, 527 F.3d 982, 985 (9th Cir.

19 2008) (quoting <u>Brody v. Transitional Hosps. Corp.</u>, 280 F.3d 997,

20 1006 (9th Cir. 2002)).  A statement is material if there is a

21 "substantial likelihood that the disclosure of the omitted fact

22 would have been viewed by the reasonable investor as having

23 significantly altered the 'total mix' of information made

24 available."  <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449

25 (1976).

26     Only conduct that is deceptive or manipulative violates

27 Section 10(b) of the Exchange Act or Rule 10b-5.  <u>Santa Fe Indus.,</u>

28 <u>Inc. v. Green</u>, 430 U.S. 462, 474 (1977).  Consequently, neither

Section 10(b) nor Rule 10b-5 "reach breaches of fiduciary duty, which are only actionable under state law," <u>Cement & Concrete</u>, 964 F. Supp. 2d at 1138 (citing <u>Santa Fe</u>, 430 U.S. at 473-74; <u>Vaughn v. Teledyne, Inc.</u>, 628 F.2d 1214, 1222 (9th Cir. 1980)), and securities plaintiffs cannot "bootstrap" such breach of fiduciary duty claims into a securities fraud suit "by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives." <u>Panter v. Marshall Field & Co.</u>, 646 F.2d 271, 288 (7th Cir. 1981).

### 1. <u>Misstatement or Omission with Respect to Polycom's Operating Expenses</u>

The Polycom Defendants and Miller's central argument is that Plaintiff has failed to adequately plead a material misstatement or omissions with respect to Polycom's expenses because he has not adequately pleaded that the amounts of Miller's expense reimbursements were material. As Defendants point out, when Polycom announced Miller's resignation, Polycom also disclosed that the Audit Committee had investigated Miller's improper expense reports and concluded that "[t]he amounts involved <u>did not have a material impact on the Company's previously reported financial statements for any period</u>." FAC ¶ 100 (emphasis added). Relying on cases like <u>Parnes v. Gateway 2000, Inc.</u>, 122 F.3d 539, 547 (8th Cir. 1997), which held that an overstatement of assets that represented only two percent of the company's total assets was immaterial as a matter of law, Defendants argue that no matter how Miller's improper expenses are calculated they are so insignificant as to be immaterial as a matter of law. <u>See also, e.g.</u>, <u>Gavish v.</u>

United States District Court
For the Northern District of California

_Revlon, Inc._, No. 00-CIV-7291(SHS), 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004); _In re First Union Corp. Sec. Litig._, 128 F. Supp. 2d 871, 895 (W.D.N.C. 2001); _In re Newell Rubbermaid Inc. Sec. Litig._, No. 99-C-6853, 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000).

Plaintiff ripostes that materiality is not merely a quantitative inquiry, and the Court must consider qualitative factors in assessing whether a misstatement or omission was material. _ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co._, 553 F.3d 187, 203-04 (2d Cir. 2009) ("[B]oth quantitative and qualitative factors must be considered in determining materiality."). But as Defendants point out, that very case states that misrepresentations involving insignificant percentages of financial disclosures "when taken in context, could be immaterial as a matter of law." _Id._ at 204. In this context, Defendants conclude, any misstatement or omission regarding Polycom's operating expenses was so miniscule as to be immaterial as a matter of law.

Plaintiff is right. Even assuming, as Defendants argue, that these misstatements or omissions were "minor or technical in nature," _Daou_, 411 F.3d at 1020, and thus quantitatively immaterial, Plaintiff has adequately pleaded materiality because "[i]nvestors have a right to know -- and would consider it important -- when the head of a publicly-owned company is stealing any quantity of money from their company." _SEC v. Pace_, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) (citing _United States v. Fields_, 592 F.2d 638, 650 (2d Cir. 1978)). In other words, when a corporation classifies personal expenses as operating expenses because its CEO

**United States District Court**
For the Northern District of California

is (even if surreptitiously) improperly claiming reimbursement for substantial amounts (at least $190,000 according to the SEC, see Cease-and-Desist at ¶ 3) of personal expenses, a reasonable investor would consider that fact as having "significantly altered the 'total mix' of information made available." See Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quoting TSC Indus., 426 U.S. at 449); cf. SEC v. Das, 2010 WL 4615336, at *8 (D. Neb. Nov. 4, 2010) ("[I]nvestors may base their investment decisions, at least in part, on factors such as . . . management ethics and accountability.").

Miller attempts to distinguish these cases, pointing out that Pace involved a CEO who was criminally convicted of illegally diverting funds and keeping those diversions off the corporate books. Miller Reply at 4-5. Here, as Miller notes, his improper expenses were on the books and approved by Polycom's CFOs. As a result, Miller concludes, "[m]isclassifying expenses, which were known about and approved by Polycom's CFOs, does not amount to corporate theft." Id. at 5. However, whether Miller's actions are labeled "corporate theft" or "improperly claiming reimbursement for personal expenses," is irrelevant. What matters is the "substantial likelihood that the disclosure of [Miller's improper expense reports] would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." Basic, 485 U.S. at 231-32 (quotation omitted). Hence Plaintiff has adequately pleaded materiality as to this claim.

### 2.   False or Misleading Statements

Second, while Plaintiff's complaint cites several allegedly materially false or misleading statements, Defendants argue these

10

statements are immaterial or otherwise not actionable, bootstrapped breach of fiduciary duty claims.  As a result, they conclude the Complaint fails to plead any actionable misstatements or omissions with respect to these statements.  The Court agrees, and will address each allegedly materially false or misleading statement in turn.

### a.   Risk Disclosures Regarding Executive Retention

First, several of Polycom's annual and quarterly filings with the SEC contained the following statement:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader.  As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges.  Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition.  For example, our Chief Marketing officer has recently left the Company.  Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

FAC ¶ 71; see also id. ¶¶ 75, 77, 79, 82, 86, 88, 90, 94, 98 (quoting the same or a substantially similar statement).  Plaintiff alleges this statement was materially false or misleading because it failed to disclose that Miller was misappropriating Polycom funds and submitting false expense reports, thus risking his termination from the company and jeopardizing Polycom's plans for future success.

**United States District Court**
For the Northern District of California

This statement is not actionable for several reasons.  First, as other courts have found, this sort of vague, routine, and general statement is immaterial.  <u>See, e.g.</u>, <u>Cement & Concrete</u>, 964 F. Supp. 2d at 1141 (rejecting as immaterial a risk factor stating that "the loss of executives and key employees could have a significant impact on our operations").  Moreover, even if material, this statement is not false or misleading and did not trigger a duty to disclose Miller's misappropriation of Polycom funds.  As several other courts in this District have found in rejecting similar allegations, "the disclosure here, if anything suggests that some personnel might leave, not that [Miller] would stay."  <u>Id.</u> (citing <u>In re FoxHollow Techs., Inc. Sec. Litig.</u>, No. 06-cv-4595-PJH, 2008 WL 2220600, at *18-19 (N.D. Cal. May 27, 2008), <u>aff'd</u>, 359 F. App'x 802, 805, n.1 (9th Cir. 2009)("[T]he risk disclosure statements cited by plaintiff [would not] have reasonably led anyone to conclude that FoxHollow intended to retain management.  Instead, the statements convey the opposite impression -- that FoxHollow's management was subject to change, that personnel might be replaced, and that investors should be aware of that possibility.")).

This is true even though, as Plaintiff points out, some versions of this statement specifically reference Polycom's "go-to-market" strategy, which Miller was hired to take over.  <u>See</u> FAC ¶¶ 79, 82, 86, 88, 90.  In Plaintiff's view, the reference to the "go-to-market" strategy, which stated that "[f]uture changes to our executive and senior management teams . . . could cause disruption to the business and have an impact on our ability to execute successfully in future periods, particularly with respect to the

execution of our go-to-market strategy . . . ," <u>id.</u> at ¶ 79, is sufficient to render these statements material and to create a duty to disclose Miller's misconduct.  Opp'n at 12-13 & n.3.

But even with the reference to the "go-to-market" strategy, these statements are not sufficiently specific to be material and, even if material, are not misleading.  The statements do "not mention any employee by name," nor is there anything contained in any of the executive retention statements "sufficiently specific to have created an 'impression' that became false" because of Miller's misconduct.  <u>FoxHollow</u>, 2008 WL 2220600, at *18.  On the contrary, "[n]o rational investor would conclude from such statements of corporate optimism" that Polycom intended to retain Miller or that Miller was not misappropriating Polycom funds.  <u>See</u> <u>id.</u>  If anything, these statements merely remind investors that Miller or any other member of the senior executive or management teams might leave Polycom, not that Miller's position was secure or no misconduct was afoot.  This distinguishes this case from those Plaintiff cites involving material misrepresentations coupled with non-disclosure, and makes clear this statement is not actionable. <u>See, e.g.</u>, <u>Siracusano v. Matrixx Initiatives, Inc.</u>, 585 F.3d 1167, 1181 (9th Cir. 2009) (finding similar statements actionable where they failed to indicate that the risk "may already have come to fruition"), <u>aff'd</u>, 131 S. Ct. 1309 (2011); <u>Berson v. Applied Signal Tech., Inc.</u>, 527 F.3d 982, 987 (9th Cir. 2008) ("But learning that stop-work orders <u>might</u> be issued is quite different from knowing they were <u>in fact</u> issued.") (emphasis in original); <u>Provenz v. Miller</u>, 102 F.3d 1478, 1489 (9th Cir. 1996); <u>Voit v. Wonderware Corp.</u>, 977 F. Supp. 363, 370-71 (E.D. Pa. 1997) (concluding that

United States District Court
For the Northern District of California

cautionary warnings about the loss of key employees were actionable where the Defendant had specific plans to replace the CEO at the time the statements were made).

### b. **Polycom's Code of Business Ethics**

Second, several of Polycom's SEC filings contained a reference to Polycom's Code of Business Ethics, which provides that:

> Protecting Polycom's assets is a key responsibility of every employee, agent and contractor. Care should be taken to ensure that assets are not misappropriated, loaned to others, or sold or donated without appropriate authorization. All Polycom employees, agents and contractors are responsible for the proper use of Polycom assets, and must safeguard such assets against loss, damage, misuse or theft. Employees, agents or contractors who violate any aspect of this policy or who demonstrate poor judgment in the manner in which they use any Polycom asset will be subject to disciplinary action, up to and including termination of employment or business relationship at Polycom's sole discretion.
>
> * * *
>
> Polycom funds must be used only for Polycom business purposes. Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom receives good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure. Expense reports must be accurate and submitted in a timely manner. Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.

Id. at ¶¶ 72, 83, 95 (emphasis omitted) (quoting the same or substantially similar language). Plaintiff alleges this statement was false or misleading because Miller expressly acknowledge his "understanding of, and commitment to, the standards and policies" in the Code of Business Ethics in his offer letter, filed with the SEC. FAC ¶ 46. Plaintiff argues this acknowledgment and Polycom's statements about its ethics code became false or misleading because they did not disclose Miller's violations, and that Polycom had a duty to update these statements because they "bec[a]me misleading

1  as a result of intervening events." <u>See</u> <u>In re Time Warner Inc.</u>
2  <u>Sec. Litig.</u>, 9 F.3d 259, 267 (2d Cir. 1993).

3      This language, whether in the Code of Business Ethics itself,
4  or Miller's acknowledgement of his "understanding of, and
5  commitment to" the standards contained therein are "inherently
6  aspirational" and hence immaterial.  <u>See</u> <u>Andropolis v. Red Robin</u>
7  <u>Gourmet Burgers, Inc.</u>, 505 F. Supp. 2d 662, 685-86 (D. Colo. 2007);
8  <u>see also</u> <u>Retail Wholesale & Dept. Store Union Local 338 Retirement</u>
9  <u>Fund v. Hewlett-Packard Co.</u>, -- F. Supp. 2d --, 2014 WL 2905387, at
10  *6 (N.D. Cal. 2014); <u>Cement & Concrete</u>, 964 F. Supp. 2d at 1138.
11  No reasonable investor would have construed either the statement in
12  Miller's offer letter or Polycom's Code of Business Ethics as "not
13  just an aspirational statement of intention, but a warranty that
14  [Miller was] compliant." <u>Retail Wholesale</u>, 2014 WL 2905387, at *6.
15  Nor are these statements the kind of "clear, factual, and forward-
16  looking" statements that trigger a duty to update.  <u>In re</u>
17  <u>FoxHollow</u>, 359 F. App'x at 804-05.  Acknowledging an understanding
18  of and commitment to Polycom's Code of Business Ethics is simply
19  not the same as warranting that Miller would never violate the
20  policy in the future.  <u>Cf.</u> <u>Retail Wholesale</u>, 2014 WL 2905387, at *7
21  (distinguishing cases finding actionable misrepresentations
22  regarding compliance with company policy because the defendant "did
23  not make affirmative representations <u>that it was in compliance</u> with
24  its" internal ethics rules) (emphasis added).

25          **c.   Internal Controls**

26      Third, Polycom's annual SEC filings contained this statement
27  (or a similar statement for subsequent years) about Polycom's
28  internal controls:

> We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of this evaluation, management has concluded that, as of December 31, 2010 our internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Id. at ¶¶ 70, 81, 93. Plaintiff alleges this statement was false because "[e]ffective internal controls would have, at the very least, included procedures to verify that the Company's chief executives did not misappropriate Polycom's assets." Opp'n at 25.

This allegation is nothing more than a non-actionable "generalized claim[] of mismanagement . . . ." See In re The First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 161 (D. Mass. 2009); see also In re Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 638-39 (3d Cir. 1989) (warning against allowing "artful legal draftsmanship" to work around the general rule that "claims essentially grounded on corporate mismanagement are not cognizable under federal law"); Andropolis, 505 F. Supp. 2d at 683-84 (discussing allegations of corporate mismanagement, which "do[es] not support a federal cause of action"). In Andropolis v. Red Robin Gourmet Burgers, the court addressed similar allegations based on "representations in Red Robin's Form 10-Q's [sic] and press releases that management had evaluated the Company's disclosure and financial reporting controls and found them to be effective were false and misleading when made" because they "omitted . . . that these systems were significantly deficient." Id. at 683. Noting the Supreme Court's holding in Santa Fe

**United States District Court**
For the Northern District of California

1  _Industries v. Green_, 430 U.S. 462, 474-79 (1977) that the

2  securities laws do not create a federal remedy for corporate

3  misconduct, and the "now clearly established rule that a plaintiff

4  may not 'bootstrap' a claim for internal corporate mismanagement or

5  breach of fiduciary duty by alleging that the corporation or its

6  directors failed to disclose that mismanagement or breach," the

7  Court concluded that the "'central thrust' of Plaintiff's

8  allegations . . . allege[d] nothing more than corporate

9  mismanagement and, thus, do[es] not support a federal cause of

10 action." _Id._ (citing _Panter_, 646 F.2d at 289; _In re United_

11 _Telecommc'ns, Inc. Sec. Litig._, 781 F. Supp. 696, 699 (D. Kan.

12 1991)).

13     Here too, the "central thrust" of Plaintiff's allegations is

14 that Polycom's board failed to correctly assess the adequacy of its

15 internal controls -- not that it sought to deceive investors about

16 the quality of those controls.  As in _Andropolis_, "[t]he crux of

17 Plaintiff's argument is that even though there were numerous

18 signals, as reported by confidential witnesses, of [Polycom's]

19 corporate deficiencies, [Polycom] misstated that management had

20 evaluated and approved the Company's disclosure procedures and

21 internal reporting controls, and omitted to state that these

22 systems were significantly deficient." _Id._  Simply put, these are

23 not actionable.

24     Moreover, "[t]here is no securities fraud by hindsight." _City_

25 _of Livonia Emps. Retirement Sys. & Local 295/Local 851 v. Boeing_

26 _Co._, 711 F.3d 754, 758 (7th Cir. 2013) (Posner, J.).  Yet that is

27 what Plaintiff has pleaded here.  Today, with the benefit of

28 knowing the details of Miller's misconduct and the failure of

United States District Court
For the Northern District of California

Polycom's internal controls to catch that misconduct, it might seem
misleading for Polycom to have stated its internal controls were
adequate.  But the Court cannot simply assume there was
mismanagement and internal controls were inadequate simply because
Miller managed to steal from Polycom.  After all, even a "full set
of supervisory mechanisms to oversee a company" may fail to uncover
misconduct or fraud.  David B. Shaev Profit Sharing Acct. v.
Armstrong, No. Civ.A. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb.
13, 2006), aff'd, 911 A.2d 802 (Del. 2006).  Moreover, even if the
Court could make such an assumption, Plaintiff still has not
pleaded how, if at all, Polycom's internal controls were actually
inadequate.

In short, these allegations are simply insufficient to give
rise to a claim of securities fraud.

### d.    Conference Call Statement

Finally, on a conference call in February 2013, while
discussing the departure of another executive, Sudhakar
Ramakrishna, Miller said:

> Like anything else, Rama has aspirations; one day he'd
> like to be a CEO.  And right now, I am and I'm planning
> on being here for quite a period of time.  So this has no
> implications on anything outside of being able to focus
> on software, focus on our next-generation platform, and
> to do it with style.

Id. at ¶ 92.  Plaintiff alleges this statement is false and
misleading because, at the time the statement was made, Miller's
position was in jeopardy by virtue of his misappropriation of
Polycom funds.

This statement was not false or misleading when made.  All
Miller's statement communicates is his then-present plan to stay at

18

**United States District Court**
For the Northern District of California

Polycom for "quite a period time."  Unlike other cases finding similar statements actionable, here there is no allegation that Miller actually was not planning on remaining at Polycom for the foreseeable future.  See Voit v. Wonderware Corp., 977 F. Supp. 363, 370 (E.D. Pa. 1997) (finding a similar statement false and misleading where the company issued a press release suggesting the CEO would remain when in fact his replacement had already been hired), abrogated on other grounds, In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999).  Instead, the fact that a person might be fired if his misconduct is uncovered does not make it false or misleading that he plans not to be fired (and thus to remain at the company).

**B.   Scienter**

Both Miller and the Polycom Defendants argue that Plaintiff has failed to adequately plead the requisite "strong inference" of that they acted intentionally or deliberately to deceive investors. Tellabs, 551 U.S. at 313-14.  In determining whether Plaintiff's allegations give rise to a "strong inference" of scienter, the Court must look at all the facts alleged and consider "plausible opposing inferences." Id. at 322-23.  In short, if Plaintiff's allegations are to go forward, the Court must conclude that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

The Court will address the allegations of Miller's scienter first, before turning to the CFOs' scienter, and finally, Polycom's scienter.

///

United States District Court
For the Northern District of California

### 1.   **Miller's Scienter**

Miller argues that Plaintiff has failed to plead his scienter because Plaintiff has not pleaded facts giving rise to a strong inference that, in making statements in press releases or SEC filings Miller "either intended to mislead investors or knew (or should have known) that failing to disclose his [alleged mis-]conduct would artificially inflate [Polycom's] stock." Cement & Concrete, 964 F. Supp. 2d at 1143.  In Miller's view, even if he had a culpable state of mind in submitting his expense reports, that is insufficient absent "some degree of subjective understanding of the risk of misleading others . . . ." SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1092 (9th Cir. 2010).

However, the very case on which Miller relies, Cement & Concrete Workers District Council Pension Fund v. Hewlett Packard Company, belies his position.  In Cement & Concrete, the court found that statements about risk factors and executive retention or the issuance and updating of Hewlett Packard's business conduct policies were immaterial even though they did not communicate that HP's CEO had violated the policies and was at risk of termination for concealing improper expense submissions, allegedly sexually harassing a consultant, and inappropriately revealing confidential information.  964 F. Supp. 2d at 1134-35, 1138-42.  While the Cement & Concrete court concluded that, as Miller points out, the plaintiff inadequately alleged scienter, the court also noted that "assuming the Court had determined that the statements and omissions at issue were material, it is probable that the Court

1  would reach a different conclusion as to the scienter
2  requirement . . . ."  Id. at 1143.

3      This is a crucial distinction.  Unlike the Cement & Concrete
4  court, the Court has already concluded Defendants made a material
5  misstatement or omission -- the misstatement of Polycom's operating
6  expenses.  Furthermore, as with the CEO in Cement & Concrete,
7  Miller was no shrinking violet.  See id. at 1143 (citing Platforms
8  Wireless, 617 F.3d at 1094 ("When the defendant is aware of the
9  facts that made the statement misleading, he cannot ignore the
10  facts and plead ignorance of the risk.") (quotation omitted)).  One
11  does not claim as business expenses the cost of charter flights,
12  expensive meals, $500 ties, or luxury cars for personal use when
13  that conduct is expressly prohibited by company policies and hide
14  those numerous inappropriate expense claims without intent to
15  defraud.  See Cement & Concrete, 964 F. Supp. 2d at 1143; In re
16  Nature's Sunshine Prods. Sec. Litig., 486 F. Supp. 2d 1301, 1311
17  (D. Utah 2007) ("Evidence that a defendant has taken steps to
18  cover-up [sic] a misdeed is strong proof of scienter.").
19  Furthermore, Miller resigned once his misconduct became clear, "a
20  fact that 'provides minimal non-dispositive supporting evidence of
21  scienter.'"  Cement & Concrete, 964 F. Supp. 2d at 1143 (quoting In
22  re Impax Labs., Inc., Sec. Litig., No. C 04-04802 JW, 2007 WL
23  7022753, at *10 (N.D. Cal. July 18, 2007), reconsideration granted
24  on different grounds, 2008 WL 1766943 (N.D. Cal. Apr. 17, 2008)).
25  These allegations are sufficient to give rise to "a reasonable
26  belief of [Miller's] knowledge of false or misleading statements
27  that were either reckless or intended to defraud," Cement &
28  ///

1    <u>Concrete</u>, 964 F. Supp. 2d at 1143, and give rise to a strong

2    inference that Miller acted with the requisite state of mind.

3         **2.   The CFOs' Scienter**

4         The CFOs also argue that the Complaint fails to give rise to a

5    strong inference that they acted with scienter.   Pointing to

6    Plaintiff's allegations that Miller concealed his misconduct and

7    deficiencies with Plaintiff's confidential witnesses ("CWs"), the

8    CFOs contend that the strongest inference is not that they were

9    complicit in Miller's misconduct or misleading shareholders, but

10   rather that they too were duped by Miller.   The Court agrees.

11        Plaintiff's allegations of scienter against the CFOs are

12   primarily based on the contentions of Plaintiff's seven CWs.

13   However, as Defendants point out (and Plaintiff largely does not

14   dispute) the CWs' allegations are rife with defects.   Chiefly,

15   Plaintiff does not allege anything more than speculation about the

16   CFOs' state of mind.   Instead, Plaintiff's CWs largely repeat

17   uncorroborated hearsay and office gossip or other "impressions

18   [from] witnesses who lacked direct access to the [CFOs] but claim

19   that" the CFOs must have known of Miller's misconduct by virtue of

20   their position, without providing any "first hand knowledge

21   regarding what the [CFOs] knew." <u>Police Ret. Sys. v. Intuitive</u>

22   <u>Surgical, Inc.</u>, 759 F.3d 1051, 1063 (9th Cir. 2014).   As other

23   courts have found, these sorts of "generalized claims about

24   corporate knowledge [that] offer[] no reliable personal knowledge

25   concerning the individual defendants' mental state" are

26   insufficient to satisfy the scienter requirement. <u>See</u> <u>Perrin v.</u>

27   <u>Sw. Water Co.</u>, No. 2:08-cv-7844-JHN-AGRx, 2011 WL 10756419, at *12

28   (C.D. Cal. June 30, 2011), <u>aff'd in part & rev'd in part on other</u>

United States District Court
For the Northern District of California

1   grounds sub nom., Hemmer Grp. v. Sw. Water Co., 527 F. App'x 623

2   (9th Cir. 2013); see also Zucco, 552 F.3d at 998 (rejecting CW

3   allegations stating, among other things, that by virtue of an

4   executive's role he "had to have known what was going on" with

5   respect to a misrepresentation or omission).

6       Furthermore, Plaintiff's CWs suffer from two additional

7   defects.  First, four of the seven CWs do not even mention either

8   of the CFOs, let alone make allegations about their states of mind.

9   FAC ¶¶ 48-50, 57, 60, 63-65.  Second, at the relevant times, the

10  remaining three CWs were not even employed by Polycom.  See id. at

11  ¶ 51 (stating that the fourth CW left Polycom seven months before

12  the Class Period began); ¶ 52 (stating the fifth CW left Polycom

13  eight months before the Class Period began), ¶¶ 26, 53 (discussing

14  allegations by Plaintiff's sixth CW regarding CFO Brown despite

15  leaving Polycom four months before Brown became CFO).  The Ninth

16  Circuit has rejected the allegations of CWs under similar

17  circumstances, finding that, while these individuals may have had

18  relevant information at the time they were employed, they lacked

19  reliable information after that point.  See Zucco, 552 F.3d at 996.

20  In short, as in Zucco, "[s]ome of the confidential witnesses were

21  simply not positioned to know the information alleged, many report

22  only unreliable hearsay, and others allege conclusory assertions of

23  scienter."  Id.  As a result, these allegations are not

24  sufficiently reliable or compelling to give rise to a strong

25  inference of scienter by the CFOs.

26      Nor can Plaintiff's remaining allegations against the CFOs

27  save their claims.  While Plaintiff points to certifications signed

28  by the CFOs on Polycom's financial statements, the Ninth Circuit

**United States District Court**
For the Northern District of California

1   has found this boilerplate language "add[s] nothing substantial to

2   the scienter calculus." Id. at 1003-04.  Similarly, Plaintiff's

3   allegations that the CFOs had motive and opportunity to ignore

4   Miller's misconduct are clearly insufficient standing alone to give

5   rise to a strong inference of scienter.  See Silicon Graphics, 183

6   F.3d at 974 (holding that while "facts showing mere recklessness or

7   a motive to commit fraud and opportunity to do so may provide some

8   reasonable inference of intent, they are not sufficient to

9   establish a strong inference of deliberate recklessness.")

10  (emphasis in original).

11      In conclusion, none of these allegations are sufficient to

12  raise the requisite strong inference of scienter against the CFOs.

13  Hence, Plaintiff's claims against Kourey and Brown are DISMISSED.

14          **3.   Polycom's Scienter**

15      Plaintiff's allegations of Polycom's scienter rest on the

16  general rule that the scienter of a corporation's executives can be

17  imputed to the corporation.  See Cho v. UCBH Holdings, Inc., 890 F.

18  Supp. 2d 1190, 1204-05 (N.D. Cal. 2012).  As a result of this

19  presumption, Plaintiff argues Miller's scienter should be imputed

20  to Polycom.

21      This general rule itself stems from another general rule in

22  the agency context that an agent has a duty to inform his principal

23  of all material information.  Because an agent has a duty to inform

24  his principal of all material facts, the law presumes that the

25  agent has in fact done so.  See In re ChinaCast Educ. Corp. Sec.

26  Litig., No. CV 12-4621-JFW (PLAx), 2012 WL 6136746, at *9 (C.D.

27  Cal. Dec. 7, 2012) (citing In re Cendent Corp. Sec. Litig., 109 F.

28  Supp. 2d 225, 232 (D.N.J. 2000)).  However, as other courts have

**United States District Court**
For the Northern District of California

1  recognized, a presumption like this is only useful insofar as it

2  accurately describes human behavior.  See Cendent, 109 F. Supp. 2d

3  at 232 ("But legal presumptions ought to be logical inferences

4  from" human behavior).  While faithful agents will ordinarily keep

5  their principals apprised of material information, a faithless

6  agent, pursuing his own selfish interests and seeking to defraud

7  his principal, will obviously not inform his principal of that

8  plan.  See id.

9      As a result, courts have frequently refused to impute the

10  scienter of executives to their corporation where the executive

11  "act[ed] out of [nothing] other than [his] own self interest," and

12  his conduct did not benefit the corporation.  See ChinaCast, 2012

13  WL 6136746, at *10; see also In re Refco Sec. Litig., 779 F. Supp.

14  2d 372, 376 (S.D.N.Y. 2011); In re JPMorgan Chase & Co. Sec.

15  Litig., C.A. No. 06 C 4674, 2007 WL 4531794, at *9 (N.D. Ill. Dec.

16  18, 2007); Alpern v. Utilicorp United, Inc., No. 92-0538-CV-W-1,

17  1994 WL 682861, at *3 (W.D. Mo. Nov. 14, 1994).  In keeping with

18  this trend, other courts have refused to apply the exception and

19  instead imputed scienter to the principal where the agent did not

20  "completely abandon the principal's interests and act entirely for

21  his own purposes." USACM Liquidating Tr. v. Deloitte & Touche LLP,

22  764 F. Supp. 2d 1210, 1218 (D. Nev. 2011); see also In re Spear &

23  Jackson Sec. Litig., 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005);

24  In re Crazy Eddie Sec. Litig., 802 F. Supp. 804, 817 (E.D.N.Y.

25  1992); 3 Fletcher Cyclopedia of Private Corp. § 789.  In keeping

26  with the ordinary allocation of the burdens on a motion to dismiss,

27  where the court cannot conclude from the four corners of a

28  plaintiff's complaint that the agent's actions were so adverse to

**United States District Court**
For the Northern District of California

the principal as to "practically destroy the relation of
agency . . . ," applying the adverse interest exception on a motion
to dismiss is inappropriate.  See Cement & Concrete, 964 F. Supp.
2d at 1144 (quotation omitted).

        If this were the full extent of the adverse interest
exception, the Court would have little difficulty concluding it
applies in this case.  After all, "'theft or looting or
embezzlement' . . . is the classic example of the adverse interest
exception," Refco, 779 F. Supp. 2d at 376 (quotation omitted); see
also USACM, 764 F. Supp. 2d at 1218, and that is precisely what
Plaintiff alleges Miller did.  See FAC ¶¶ 6, 16.  But Plaintiff
argues that another agency doctrine -- apparent authority -- may
rescue their claims.  As Plaintiff notes, some courts have
concluded "the adverse interest exception is inapplicable where a
corporate officer or director makes a material misstatement or
omission to an innocent third-party while acting with the apparent
authority of the corporation for whom he works."  In re Tyco Int'l,
Ltd., No. MDL 02-1335-B, 2004 WL 2348315, at *6 (D.N.H. Oct. 14,
2004); see also Puskala v. Koss Corp., 799 F. Supp. 2d 941, 947
(E.D. Wis. 2011) (finding "even if the adverse interest exception
applies, that "does not mean that [the agent's] fraud cannot be
imputed to the company under principles of apparent
authority . . . .").  However, other cases have applied the adverse
interest exception even where the allegedly faithless agent made a
material misstatement or omission to a third party with the
apparent authority of the corporation.  See, e.g., JPMorgan Chase,
2007 WL 4531794, at *8-9.

**United States District Court**
For the Northern District of California

In the end, the Court finds the adverse interest exception applies, and hence the Court will not impute Miller's scienter to Polycom.  Admittedly, this is a close question: the interrelationship between the adverse interest exception, respondeat superior, and apparent authority in this context is severely muddled, and both sides have compelling arguments. However the facts alleged in this case most closely mirror those cases that applied the adverse interest exception.  To be sure, Plaintiff alleges that Polycom experienced a fleeting and unintended period of stock price inflation, however it is Polycom that paid Miller's improper expenses, and it is Polycom that lost a significant percentage of its value when Miller's misconduct was revealed.  In this way, Polycom is like the defendant in a recent Ninth Circuit case that concluded that because the plaintiff's allegations "tend to paint [Polycom] as a victim of [Miller's] behavior, rather than as a potentially culpable perpetrator of fraud," scienter was inadequately pleaded.  See <u>Luxembourg Gamma Three Sarl v. Spot Runner, Inc.</u>, 655 F.3d 1039, 1056-57 (9th Cir. 2011).

As a result, the Court finds that the adverse interest exception bars the imputation of Miller's scienter to Polycom. Thus, Defendants' motions are GRANTED as to Polycom.

**C.   Loss Causation**

Next, Miller argues that Plaintiff has inadequately pleaded loss causation.

The loss causation element tests whether a "causal connection [exists] between the material misrepresentation and the loss," <u>Dura Pharmaceutical, Inc. v. Broudo</u>, 544 U.S. 336, 341 (2005), and is

**United States District Court**
For the Northern District of California

akin to the concept of proximate cause in tort law.  See Daou, 411
F.3d at 1025.  Federal Rule of Civil Procedure 9(b) applies to
allegations of loss causation, and hence loss causation must be
pleaded with particularity.  Or. Pub. Emp. Ret. Fund v. Apollo
Grp., Inc., 774 F.3d 598, 605 (9th Cir. 2014); see also Katyle v.
Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011) ("We
review allegations of loss causation for 'sufficient specificity,'
a standard largely consonant with Fed. R. Civ. P. 9(b)'s
requirement that averments of fraud be pled with particularity.")
(quotation omitted).  In so doing, a plaintiff need not plead
"'that a misrepresentation was the sole reason for the investment's
decline in value . . . ,'" Daou, 411 F.3d at 1025 (quoting Robbins
v. Koger Props., Inc., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997))
(emphasis in original), and so long as "'the misrepresentation is
one substantial cause of the investment's decline in value, other
contributing forces will not bar recovery under the loss causation
requirement,' but will play a role 'in determining recoverable
damages.'"  Id. (quoting Robbins, 116 F.3d at 1447 n.5).

Plaintiff's loss causation allegations center around an
approximately 15 percent drop in Polycom's stock price on the heels
of a Polycom press release announcing that the "Audit Committee of
the Board completed a review of certain of Mr. Miller's expense
submissions . . . and . . . found certain irregularities in these
submissions.  At the conclusion of the review, Mr. Miller accepted
responsibility and submitted [a resignation] letter . . . ."  FAC ¶
100.  The press release also referenced Polycom's previously
reported financial statements, and stated that the amounts involved
in Miller's expense submissions "did not have a material impact on

the Company's previously reported financial statements . . . ." Id. "On this news, shares of Polycom fell $1.68 . . . or over 15[] percent, to $9.50 per share . . . ." Id. ¶ 102.  "This decline wiped out over $275 million in market value." Id.

At the same time Polycom announced this news, it also announced disappointing financial results, downgraded revenue guidance for the following quarter, and pointed out several other causes of concern for the future.  ECF No. 54 ("Besirof Decl.") Exs. 1, 2, 9.[4]  Analysts questioned Polycom's "organizational stability," management's credibility, and whether additional management changes would follow.  FAC ¶ 103.  Analysts also downgraded Polycom to "underperform," or "underweight," and suggested that Miller's departure "raises red flags." Id.  Thus, Plaintiff concludes "[a]s a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages." Id. ¶ 105.

Relying heavily on Metzler Investments GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1062 (9th Cir. 2008), Miller argues that Plaintiff's loss causation allegations are insufficient for three reasons: (1) Plaintiff "makes no attempt to isolate that portion of the $1.68 stock drop allegedly caused by the revelation

---

[4] These exhibits and others are the subject of a request for judicial notice, ECF No. 55 ("RJN").  Courts routinely take judicial notice of these types of documents (SEC filings, analyst reports, stock price data, and news reports) without converting the motion to dismiss into a motion for summary judgment.  See In re Netflix Sec. Litig., 964 F. Supp. 2d 1188, 1190 n.1 (N.D. Cal. 2013).  Because these documents are "not subject to reasonable dispute," are not disputed by Plaintiff, and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Federal Rule of Evidence 201(b), the request is GRANTED and the Court takes judicial notice of these documents.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  of 'fraud' from this 'tangle of [other] factors' affecting the

2  share price," Miller Mot. at 18; (2) Polycom's stock price was

3  either not inflated by the alleged misrepresentations or gained

4  back its value in short order; or (3) Plaintiff has not alleged a

5  corrective disclosure in which "the practices that the plaintiff

6  contends are fraudulent were revealed to the market and caused the

7  resulting losses." Metzler, 540 F.3d at 1063.

8      First, the Court can find no support Ninth Circuit precedent

9  for Miller's contention that Plaintiff must isolate what portion of

10 the stock drop was caused by the revelation the alleged fraud as

11 opposed to Polycom's simultaneously-announced poor financial

12 results at the pleading stage.  On the contrary, Miller's sole

13 Ninth Circuit citation for this proposition is an out of context

14 quote from Metzler simply stating that it would be an unwarranted

15 to infer that stock drops following two events -- a newspaper story

16 discussing an investigation of potential misconduct at one of the

17 88 for-profit colleges owned by defendant, and an announcement of

18 "higher than anticipated attrition" -- that the market was reacting

19 to a scheme involving company-wide manipulation of student records

20 to obtain funding from the federal government when the much more

21 plausible conclusion was the market was reacting to negative

22 earnings news.  Id. at 1065.  Unlike Metzler, on these facts and in

23 response to this disclosure, there is nothing "unwarranted" or

24 implausible about concluding that, as Plaintiff alleges, Plaintiff

25 and the class "suffered significant losses and damages" as a result

26 of the revelation of Miller's improper expense reports.  FAC ¶ 105.

27 On the contrary, an analyst responses quoted in the Complaint

28 suggests that the market was responding to the disclosure of

30

1    Miller's misconduct. <u>See</u> FAC ¶ 103 ("The departure of CEO Andy

2    Miller . . . <u>raises red flags</u> and we believe <u>management credibility</u>

3    (at all executive levels) comes into question . . . .") (emphasis

4    added). If, as Miller argues, there are alternative causes for the

5    losses of which Plaintiff complains, that is an issue for

6    resolution in the later stages of this case. <u>See</u> <u>In re Century</u>

7    <u>Aluminum Sec. Litig.</u>, 749 F. Supp. 2d 964, 975 (N.D. Cal. 2010);

8    <u>see also</u> <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 392 (9th

9    Cir. 2010) (addressing loss causation on summary judgment).

10         Miller's second argument is baseless. Contrary to Miller's

11    apparent misconception, a stock price can decline during the class

12    period (even on the days after allegedly material misstatements or

13    omissions were issued) and still be artificially inflated. As

14    another court put it, "price declines [are] not inconsistent with

15    the theory that the price was artificially inflated, since the

16    misrepresentations may well have buoyed a price that would

17    otherwise have sunk much faster, thus raising the price at which

18    plaintiffs purchased the stock." <u>Demarco v. Robertson Stephens,</u>

19    <u>Inc.</u>, 318 F. Supp. 2d 110, 124 (S.D.N.Y. 2004). The same goes for

20    Miller's suggestion that Plaintiff suffered no loss because

21    Polycom's stock price recovered significant amounts of its lost

22    value within two months of the alleged corrective disclosure.

23    Again, Miller bases this argument on dicta from <u>Metzler</u>, and again

24    basic economic principles preclude dismissing a complaint on these

25    grounds. <u>See</u> <u>Acticon AG v. China N.E. Petroleum Holdings, Ltd.</u>,

26    692 F.3d 34, 36 (2d Cir. 2012) (concluding that price recovery

27    after the class period "does not negate the inference that

28    [plaintiff] has suffered economic loss" because the price rebound

could be explained by external events).

Finally, Miller claims that Polycom's press release is not a corrective disclosure because it did not reveal to the market "the practices that the plaintiff contends are fraudulent . . . ." Metzler, 540 F.3d at 1063. However, as Plaintiff points out, a corrective disclosure need not precisely mirror the misstatement or admit fraud. See Daou, 411 F.3d at 1026. As is made clear by a recent case in this District, In re Montage Technology Group Ltd. Securities Litigation, -- F. Supp. 3d --, 2015 WL 392669, at *8 (N.D. Cal. Jan. 29, 2015), Polycom's press release is a sufficient corrective disclosure. In Montage Technology, most of the defendant Montage's revenues came through independent distributors, with 50 percent coming from a company called LQW. Id. at *1. However, an analyst firm published a report revealing that LQW was, in fact, owned and controlled by an undisclosed affiliate of Montage. Id. After stock prices fell over 25 percent on the news, plaintiffs filed suit alleging that various SEC filings by Montage were materially false or misleading because they did not reveal the transactions with LQW were related party transactions, as required by generally accepted accounting principles. Id. Judge Illston, relying on the Ninth Circuit's recent decision in Loos v. Immersion Corp., 762 F.3d 880 (9th Cir. 2014), concluded that loss causation was sufficiently pleaded even though the analyst report did not identify fraudulent aspects of Montage's prior SEC filings. Id. at *8. "While the [analyst report] may have phrased its accusation in less than certain terms, absolute certainty is not required to adequately plead loss causation." Id. at *8 (emphasis omitted) (citing Loos, 762 F.3d at 888-89).

**United States District Court**
For the Northern District of California

Here, Polycom did not announce that Miller resigned in the wake of expense submissions that caused it to overstate its operating expenses through the class period, but such "absolute certainty" is not required.  Id.  Indeed, requiring the corrective disclosure make clear that Polycom's prior financial statements misstated operating expenses would effectively require what the Ninth Circuit has expressly disavowed: that Plaintiff plead "an outright admission of fraud [to survive] a motion to dismiss." Loos, 762 F.3d at 888-89.  To put it another way, simply because a corrective disclosure does not admit securities fraud does not mean that such a disclosure cannot form the basis of loss causation allegations in a complaint alleging violations of the securities laws not obviously disclosed in the corrective disclosure.  See id. at 890 n.3 ("To the extent an announcement contains an express disclosure of actual wrongdoing, the announcement alone might suffice.").

Accordingly, the Court finds that Plaintiff has sufficiently pleaded both a corrective disclosure and loss causation.

**D.   Regulation S-K**

Additionally, Plaintiff argues in his opposition brief that Item 402 of SEC Regulation S-K required Polycom to disclose all compensation provided to Miller in Form 10-Ks and proxy statements. 17 C.F.R. § 229.402.  However, Plaintiff has not pleaded these allegations in his Complaint.  As a result the Court does not address them.  See Bruton v. Gerber Prods. Co., 961 F. Supp. 2d 1062, 1078 (N.D. Cal. 2013) ("[I]n determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition

**United States District Court**
For the Northern District of California

to a motion to dismiss.").  Instead, along with leave to amend to cure the deficiencies set forth in this order, the Court GRANTS leave to amend to plead a violation of Item 402 within thirty (30) days of the signature date of this order.

   **E.   Section 20(a) Claim**

   Defendants' sole argument against Plaintiff's claims under Section 20(a) is that Plaintiff failed to plead the required predicate violation of the securities laws.  See 15 U.S.C. Section 78t(a); Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  However, as described above, Plaintiff has sufficiently pleaded a primary violation, and as a result, Defendants' motion to dismiss the Section 20(a) claims is DENIED.


**V.   CONCLUSION**

   For the reasons set forth above, Defendants' motions are GRANTED IN PART and DENIED IN PART.  To the extent claims are dismissed, the dismissal is WITHOUT PREJUDICE, and leave to amend is GRANTED both to cure the deficiencies set forth above and to plead the previously unpleaded legal theories described in Plaintiff's opposition.  Plaintiff may file an amended complaint within thirty (30) days of the signature date of this order. Failure to do so within thirty days may result in dismissal with prejudice.

   IT IS SO ORDERED.


   Dated: April 3, 2015

                                    _____
                                    UNITED STATES DISTRICT JUDGE